**SHEET METAL CONTRACTORS ASSO-CIATION OF SAN FRANCISCO, a Corporation, et al., Appellants,**

v.

**SHEET METAL WORKERS INTERNA-TIONAL ASSOCIATION et al.,**
Appellees.

No. 15355.

United States Court of Appeals
Ninth Circuit.

Sept. 16, 1957.

Rehearing Denied Nov. 5, 1957.

Roth & Bahrs, San Francisco, Cal., for appellant.

Gilbert, Nissen & Irvin, Robert W. Gilbert, Los Angeles, Cal., for appellee.

Before DENMAN, POPE and BARNES, Circuit Judges.

POPE, Circuit Judge.

This action was brought by the Sheet Metal Contractors Association of San Francisco and by all 28 members of that association, against the Sheet Metal Workers International Association, Local Unions Nos. 104 and 75 of that association, and the Joint Industry Board of the Heating and Sheet Metal Industry of Marin, Sonoma, Mendocino, Lake, Napa and Solano Counties, California.

The complaint alleged violation and threatened violation of the provisions of subdivisions (a) and (b) of § 302 of the Labor Management Relations Act, 1947, (29 U.S.C.A. § 186(a) and (b) ). The first of these subdivisions makes it unlawful for any employer to pay money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce; the second forbids any such representative to receive or accept any such money or thing of value.[1]

The complaint predicated jurisdiction in the court below upon the provisions of subdivision (e) of § 302 which recites that district courts shall have jurisdiction to restrain violations of that section.[2]

The members of the plaintiff association are, as the name of the Association indicates, contractors and employers of labor in the sheet metal industry. This multi-employer group was formed for the purpose of collective bargaining with their employees. The latter are members of the defendant Local Union 104 which is the union of the Sheet Metal Workers International Association having jurisdiction of the employees in that industry in the City and County of San Francisco. The association has an agreement, executed on behalf of its members, also plaintiffs here, with Local Union 104 covering rates of pay, rules and working conditions of all employees in the San Francisco area engaged in the defined sheet metal work. The members of the Association occasionally undertake contracts for the performance of sheet metal work in the nearby counties of Marin, Sonoma, Mendocino, Lake, Napa and Solano, all north of San Francisco. In the period between July 1, 1955 and

---

1. "§ 186. * * * (a) It shall be unlawful for any employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative of any of his employees who are employed in an industry affecting commerce. (b) It shall be unlawful for any representative of any employees who are employed in an industry affecting commerce to receive or accept, or to agree to receive or accept, from the employer of such employees any money or other thing of value."

2. "(e) The district courts of the United States and the United States courts of the Territories and possession shall have jurisdiction, for cause shown, and subject to the provisions of section 381 of Title 28 * * * to restrain violations of this section * * *."

June 22, in the following year, eight of the plaintiff employers named undertook to perform jobs or contracts in those northern counties or some of them employing thereon their employees, members of Local 104.

During the same period a similar association of contractors, known as Associated Heating Sheet Metal Contractors, Inc., representing sheet metal contractors doing business in those northern counties other than San Francisco, had a collective bargaining agreement with Local Union No. 75, which was the bargaining representative of their employees. Both the collective bargaining agreement covering the San Francisco employers and employees (the agreement with Local 104) and the collective bargaining agreement covering the employers and employees in the six northern counties (with Local No. 75), were similar in terms, and, in some respects, identical. They were identical in making provision for wage scales and working conditions for employees hired outside of the territory of the local union to perform or supervise work performed within the area covered by the local union's contract. Thus § 4 of Article VII in each contract provided as follows: "When sent by the Employer to supervise or perform work specified in Article I of this Agreement outside of the jurisdiction of the Union and within the jurisdiction of another Local Union affiliated with Sheet Metal Workers' International Association, journeymen sheet metal workers covered by this Agreement shall be paid at least the established minimum wage scale specified

in Section 1 of this Article, but in no case less than the established wage scale of the Local Union in whose jurisdiction they are employed, * * *"[3]

It is thus apparent that these collective bargaining agreements contemplated what actually transpired, namely, that occasionally San Francisco employers would take their employees into the other counties named, and there fulfill contracts or jobs in those areas. It will be noted from the language quoted from § 2 in the last footnote that employees moving to an area of established higher wage scales would get that higher wage scale. Under the contract of Local 104, for instance, its members working in the area of Local Union 75 would be entitled to the wage scale and working conditions of the latter union.

The complaint relates to what is alleged happens or is threatened will happen to plaintiff employers when they move their work forces into the area of Local Union 75 as contemplated by the standard provisions common to both union contracts. It appears from the complaint, as supplemented by the stipulation of the parties, that the associated contractors of these six northern counties made and entered into a so-called "trust agreement" with Local Union No. 75 whereby there was set up and established a "Joint Industry Board of Heating and Sheet Metal Industry of Marin, Sonoma, Mendocino, Lake, Napa and Solano Counties". As above noted, the Board was named as a defendant.

The agreement establishing the Joint Industry Board, in addition to specifying the purposes of the agreement, the func-

**3.** §§ 2 and 3 of the same Article also provided:
"§ 2. On all work specified in Article I of this Agreement, fabricated and/or assembled within the jurisdiction of this Union, or elsewhere, for erection and/or installation within the jurisdiction of any other Local Union affiliated with Sheet Metal Workers' International Association, whose established wage scale is higher than the wage scale specified in this Agreement, the higher wage scale of the job site Union shall be paid to the journeymen employed on such work in

the home shop or sent to the job site.
"§ 3. Except as provided in Sections 2 and 4 of this Article, the Employer agrees that journeymen sheet metal workers hired outside of the territorial jurisdiction of the Union to perform or supervise work outside the jurisdiction of the Union and within the jurisdiction of another Local Union affiliated with Sheet Metal Workers' International Association, shall receive the wage scale and working conditions of the Local Union in whose jurisdiction such work is performed or supervised."

tions of the Board, the mode of selection of the Board and its officers, and the manner in which the Board should act, was keyed into the collective bargaining agreement of Local No. 75 through addenda thereto which provided among other things that any disputes arising out of this latter agreement should be referred to the Joint Industry Board; that the provisions for settling of disputes under the collective bargaining agreement should be those stated in the so-called trust agreement. The addenda further recited that each employer should contribute to the Joint Industry Board Fund the sum of 2½ cents per hour worked by all journeymen and apprentices who were employed on the work described in the union agreement. The trust agreement was expressly made a part of the union agreement.

When the eight plaintiff employers above mentioned took their employees to the jobs in the six northern counties, demands were made upon them that they pay the 2½ cents an hour for every hour worked by each of their employees performing work in those counties. The gist of the complaint is that "defendants are attempting to cause and compel plaintiffs to pay and deliver money and other things of value to defendant Joint Industry Board", and will, unless restrained by the court, "cause the aforesaid employees of plaintiffs to strike and cease working" unless such money be paid. It is alleged that pursuant to and in compliance with the demands and threats of defendants, the eight plaintiff employers mentioned have paid certain sums listed in the complaint to the Joint Industry Board. It was stipulated that defendant Local 75 threatened to cause and induce the employees of these plaintiffs to strike and refuse to perform services in those counties unless the 2½ cents per hour were paid; and that thereafter those plaintiff employers did pay such sums into the Joint Industry Board Fund.

It is plaintiffs' claim that these payments thus induced constituted payments of money to a representative of the plaintiffs' employees made unlawful by subdivision (a) of § 302, and that such representative thereby accepted such money in violation of subdivision (b). In consequence, the plaintiffs, appellants here, say that they are entitled to an injunction to restrain such violations of § 302 under the provisions of subdivision (e).

Both plaintiffs and defendants moved for summary judgment based upon the pleadings and the stipulation of facts above mentioned. The motion of the defendants was granted and summary judgment entered for them. This appeal followed. That judgment was based upon the court's determination disclosed in its memorandum opinion that, upon the facts disclosed, the Joint Industry Board, or the union members thereof, were not representatives of the employees within the meaning of § 302. A consideration of the merits of the appeal calls for a review of that determination.

Before entering upon the merits of the case we must inquire as to our jurisdiction and that of the trial court to entertain the cause. The allegation of the complaint designed to disclose jurisdiction is as follows: "Plaintiffs are engaged in an industry affecting commerce within this district and plaintiffs are employers of employees engaged in an industry affecting commerce within the meaning of § 302, LMRA 1947." The stipulation of facts recites as follows: "During the calendar year 1955 plaintiff employers collectively made direct purchases of goods and materials from outside the State of California of value in excess of $500,000; and that plaintiff employers collectively made purchases in California through local dealers of goods and materials originating outside the State of California of a value in excess of $1,000,000; and plaintiffs collectively rendered services and furnished materials outside the State of California having a value of approximately $125,-000." This, it will be noted, refers to all 28 employer plaintiffs. There is no separate stipulation or allegation as to the quantity of purchases or sales of goods or materials or of services rendered and

materials furnished outside the State of California by the eight employers who have been compelled to pay the 2½ cents per hour about which complaint is made. It is suggested that for aught that appears here the amount of such interstate commerce of the eight employers may be de minimis; that at any rate there is no allegation which could form a basis for entertaining the suit.

We think that suggestion is without validity here for the reason that the statutory basis of jurisdiction is not directed to the character or form of the business of the employer but is built around a characterization of the employees who have the representative. Subdivision (a) of § 302 refers to *any* employer. It is made unlawful for "any employer" to pay money to a representative of any of his employees, "who are employed in an industry affecting commerce." This is made clear by appropriately italicizing the language of subdivisions (a) and (b) as follows: "(a) It shall be unlawful for *any* employer to pay or deliver, or to agree to pay or deliver, any money or other thing of value to any representative *of any of his employees who are employed in an industry affecting commerce.*

"(b) It shall be unlawful for any representative of *any employees who are employed in an industry affecting commerce* to receive or accept, or agree to receive or accept, from the employer of such employees any money or other thing of value."

The statutory test is not as to how much interstate business any particular employers may do. If on the merits it be determined that the Joint Industry Board which received the money from the eight employers was a "representative" of plaintiff's employees, then since those employees bargained with the 28 employers through their Local 104, it would be plain that we would be dealing with

payments to a representative of "employees who are employed in an industry affecting commerce." That is all that is required to satisfy these sections of the statute. They are employees in an industry affecting commerce because their union bargains with the entire association of 28 employers.

This construction is consistent with the legislative history of § 302 which is set forth in United States v. Ryan, 350 U.S. 299, 305–306, 76 S.Ct. 400, 405, 100 L.Ed. 335. When he dissented from the decision of the Court of Appeals which the Supreme Court reversed in the Ryan case, Judge Learned Hand aptly described the purpose of the legislation by saying (United States v. Ryan, 2 Cir., 225 F.2d 417, at page 426): "Congress wished to prevent employers from tampering with the loyalty of union officials, and disloyal union officials from levying tribute upon employers." The Supreme Court quoted Senator Taft's reference to a "case where the union representative is shaking down the employer." We cannot believe that in an attempt to accomplish this objective Congress intended to provide that the levying of tribute should be prohibited only where the employers were large ones whose volume of interstate business was substantial, but that the unions had full liberty to levy tribute upon the smaller employers within the same industry, even though the union officials represented employees who are employed in an industry which, as such, affected commerce.[4] We are of the opinion that such an interpretation of the statute would frustrate its purposes which, as stated in the Ryan case were broad and inclusive. We hold that there was jurisdiction in the trial court to entertain the suit and to pass upon its merits.

■  As we have noted, the trial court was of the view that the Joint Industry

4.  As noted in the Ryan case, supra, the enactment of the section was prompted in part by the report of demands made the preceding year by the United Mine Workers for a tax of 10 cents per ton on coal to be paid to the Union. See Legislative History, L.R.R.A.1947, p. 458, et seq. It is not conceivable that Congress meant to prohibit such exactions from mine operators shipping interstate, while permitting them from others doing only intrastate business.

Board was not a [145 F.Supp. 627] "representative of any employees" within the meaning of § 302. Whether that conclusion was correct is the primary question now before us. We think the answer is to be found in the language of the "trust agreement" itself and the contracts of the Unions and their references to each other and to the Joint Industry Board.

The purposes of the Board as expressed in the so-called Trust Agreement are quoted in full in the margin.[5] The Board was: 1, to administer the fund; 2, to aid in settlement of disputes between the union and the employers' association; 3, to set up a joint arbitration committee; 4, to supervise and administer an apprenticeship program; 5, to provide a forum for discussion of the problems of the industry; and 6, to cooperate with the public and quasi-public bodies with regard to legislation and other matters of interest to the industry. None of the provisions of the joint agreement were such as to bring the payments made to the Joint Industry Board within any of the exceptions stated in subdivision (c) of § 302, the most important of which permits money to be paid to a trust fund for the exclusive benefit of the employees where such payments are held in trust for the purpose of paying for medical or hospital care, pensions on retirement or death, or compensation for injuries, or illness resulting from occupational activity.[6]

5. "A—Purposes: It shall be the functions of the Joint Board:

1—To supervise, administer and carry out all funds provided for by the Bargaining Agreement, except the Health and Welfare Fund which is administered by the Joint Trustees of the Sheet Metal Workers Health and Welfare Fund of Northern California.

2—To aid in the settlement of any and all disputes of any nature whatsoever which may arise between the Union, its members, agents and/or representatives, and the above named association, its members, and all other employers of union members who are signatories to agreements with the union.

3—To set up and administer a joint arbitration committee and to provide further arbitration procedures should the Joint Arbitration Committee be unable to decide or resolve a dispute.

4—To supervise and administer a joint apprenticeship program; to establish Apprenticeship Standards; to attract persons of good moral character, ambition and competency to the industry; and to provide for the training of such persons in order to maintain and continue the high degree of skill and quality of work which now prevails in the Heating and Sheet Metal Industry.

5—To assist and aid the Heating and Sheet Metal Industry in continuing the high degree of skill which it now enjoys; to provide a forum where Management and Labor can discuss ways and means for further co-operation; to counsel and advise and render such other assistance to individual members of the Union, and all employers who are signatories hereto, which will aid and facilitate efforts to effectuate high standards in the Industry. It is understood that neither the Union nor Association shall be superseded by the Joint Industry Board as far as the relationship existing between each of them and their respective members; nor do they relinquish their responsibility to their respective members; nor do they relieve their members from the liabilities and obligations such members have to the Union or Association, respectively, under the provisions of the Constitution and By-Laws of each of them, and the same shall continue in full force and effect.

6—To meet with representatives of public and quasi-public bodies or groups and with other groups or associations in the construction Industry or allied fields; to foster, promote and urge beneficial legislation within the State of California relating to the Heating and Sheet Metal Industry, its standards, specifications, improve technological skills or any other matter pertaining thereto; to acquaint the public at large with the work of the Heating and Sheet Metal Industry and to foster good public relations. No action may be taken which knowingly violates the anti-trust and monopoly laws of the United States, the State of California, or any political subdivision thereof. The Joint Industry Board as such will take no active part in any political campaign."

6. § 302(c), (Title 29 U.S.C.A. § 186(c)), provides in part: "The provisions of this section shall not be applicable  *  *  *  (5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such

With respect to the makeup and the functioning of the Board and its officers, and the manner in which it was to carry out its assigned duties, the provisions of the trust agreement were somewhat unusual. The Board was made up of six members representing the union and six members representing the employers, but the organic agreement carefully provided against the Board acting as a unit, or its members voting individually or independently. Thus no stated part of the whole number could constitute a quorum but a quorum could exist only if three of the employer members and three of the union members were present. Officers could be elected only by a majority vote of the employer members together with a majority vote of union members and two of the officers must be employers and two union members. A general manager could be appointed only in a similar manner, and his services terminated in like manner through separate majority votes of union and employer groups. All committees were to be constituted in similar manner. It was provided: "The Board shall have the power and authority to study and correct improper working conditions and shall decide all controversies or disputes arising under this agreement. Decision of the Board shall be made by a majority vote of the Union members, together with a majority vote of the Employer members, based on full membership of the Board." Also, the designation of any representative on the Board could be revoked at any time at the pleasure of the party making the appointment.

Bearing in mind these provisions of the joint agreement, we proceed to the statutory definition of the term "representative" as used in the applicable section. § 142(3) of Title 29 U.S.C.A., which is new matter added by the Taft-Hartley Act, provides that "The terms * * * representative * * * shall have the same meaning as when used in subchapter II of this chapter as amended by this chapter". This is a reference to

the definition in the original Wagner Act which now appears in § 152(4) of Title 29 U.S.C.A., as follows: "The term 'representatives' includes any individual or labor organization." The term "labor organization" is defined in subdivision (5) of the same section as follows: "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee or plan, in which employees participate and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work."

Referring to the language just quoted, it seems plain enough that the Joint Industry Board was " [an] organization of any kind". The purposes of the Board, (footnote 5, supra), indicate that it existed for the purpose at least in part of dealing with employers concerning grievances, etc. This is apparent from the addenda to the Local No. 75 agreement which recites that "Any disputes arising out of this agreement shall be referred to the Joint Industry Board". Note particularly the statement of the purpose No. 2 in the above footnote 5, supra: "To aid in the settlement of any and all disputes of any nature whatsoever which may arise between the Union, its members, agents and/or representatives, and the above named association, its members, and all other employers of union members who are signatories to agreements with the union."

Thus we are led to the conclusion that the Joint Industry Board satisfies that part of the above quoted definition of "labor organization" which recites that it is one which exists for the purpose in whole or in part of dealing with employers concerning grievances, labor disputes, wages, etc.

■ We next inquire whether the Joint Industry Board was one "in which employees participate" within the meaning of the above quoted subdivision 5 of

employer, and their families and dependents * * *." (Added are elaborate qualifying provisos listed as (A), (B)

and (C), strictly limiting the use of such funds and the manner in which they may be set up.)

§ 152. We assume that for the purposes of this case the employees here referred to must be the employees of the plaintiffs who are members of Local 104, that is to say, the San Francisco employees.[7] It seems plain that this portion of the definition can be satisfied by any type of employee participation. It would not be necessary that any individual employee members of Local 104 be members of the Joint Industry Board trustees, or even that they participate in electing such trustees, but that if a Union which at any time or for any purpose represents those Local 104 members also participates in the Joint Industry Board, then it can be said that the Board is an organization in which employees participate. The employees participate through the Union that represents them.

In United States v. Ryan, supra, the court pointed out the reasons why the purpose of § 302 could only be accomplished through a broad and inclusive reading of the term "representative". It seems to us that for similar reasons the reference to employee participation must be given a broad meaning and that participation by representation would satisfy the meaning of this definition as applied to the problem here presented. Such we think was the clear legislative intent.

Local 75 did participate both in the formation and the operation of Joint Industry Board. The stipulation also recites that between October 13 and December 18, 1955, Local No. 75 threatened to encourage, cause and induce these employees of the plaintiffs who had been taken to the jobs in the six northern counties to refrain from performing and to refuse to perform any services in those counties, that is, to go on strike, unless plaintiffs paid the 2½ cents per hour into the Joint Industry Board Fund. When Local 75 took this action it was plainly doing so on behalf of these members of Local 104 temporarily in the northern counties and in respect to the working conditions and wage scales of these 104 members.

We have previously referred to the provisions, identical in the union contracts of both Locals, which provided that when the employers sent their employees into an outside jurisdiction the sheet metal workers shall be paid according to a wage scale "in no case less than the established wage scale of the local union in whose jurisdiction they are employed." These contracts further provide that under those circumstances the employers shall be otherwise governed by the established working conditions of said local union. In other words, the working conditions controlling these traveling 104 members are those established by Local 75. These provisions further recite that in applying them "the term 'wage scale' shall include the value of all applicable hourly contractual benefits in addition to the hourly wage rate provided in said sections." Clearly enough the 2½ cents per hour here referred to is an "applicable hourly contractual" benefit within the meaning of those provisions.

■ We think that all of this means that when Local 75 made the agreement for the collection of the 2½ cents per hour for the Joint Industry Board, it was making that arrangement not only on behalf of its own members but on behalf of the traveling sheet metal workers of other unions during the time the latter were in Local 75 territory; that when Local 75 made the deal for the 2½ cents per hour and when it undertook to call a strike of the Local 104 members in respect to the northern counties jobs, Local 75 was participating in the Joint Industry Board on behalf of the plaintiff's employees or some of them. The

---

7. Subdivision 3 of § 152 recites: "The term 'employee' shall include any employee, and shall not be limited to the employees of a particular employer, unless this subchapter explicitly states otherwise * * *." However, this suit concerns the enforcement of the provisions of § 302 and its prohibition of payment of money by an employer to a representative of any of *his* employees.

result is that the Joint Industry Board was a labor organization within the meaning of subdivision 5 of § 152 and hence a "representative" of plaintiff's employees within the meaning of subdivision 4.

The trial court's contrary determination that the Joint Industry Board, or the union members thereof, were not representatives of the employees within the meaning of § 302, was based upon that court's interpretation of the case of United Marine Division I. L. A., Local 333, A. F. of L. v. Essex Transportation Co., 3 Cir., 216 F.2d 410, 412. The court quoted the following language from that case: "These trustees were not, in our judgment, representatives of the employees. They were trustees of a welfare fund. It is true that they were chosen half and half by the employers' association and this union. But we think that when set up as a board, as they were in this case, these individuals are not acting as representatives of either union or employers. They are trustees of a fund and have fiduciary duties in connection therewith as do any other trustees. The terms under which they act were carefully spelled out."

For a number of reasons we think that the decision upon which the trial court relied is not apposite here. In the first place, the quoted language may well be mere dictum for it indicates that the court was dealing with a welfare fund which may well have satisfied the exception to the general language of § 302 which is set forth in subdivision 5 permitting the payment of money into trust funds established for the sole and exclusive benefit of employees and their families for medical or hospital care, pensions, compensation for injuries or illness, and the like. In the second place, the Essex Transportation Co. case was decided before the decision of the Supreme Court in United States v. Ryan, supra.

In the Essex case, it is plain that the language quoted gave too narrow and restricted a meaning to the term "repre-

sentatives". It is said that the trustees were not representatives of employees because they were trustees of a welfare fund, and were not acting as representatives of either union or employers since they had fiduciary duties in connection with a trust fund. We think that a mere reading of § 302 demonstrates the fallacy of any such position. If that section, as Essex suggests, means that "trustees of a fund" are for that reason not representatives within the meaning of the Act, then part 5 of subdivision (c) was wholly unnecessary and all the careful statement of an exception found there would be wholly meaningless. For the exception does not follow from the mere fact that there are trustees of a fund, but the fund must be subject to all the detailed limitations there stated. But the decision in United States v. Ryan brushed away all such narrow notions of the meaning of the term "representatives" as that used in Essex. The court said (at page 304 of 350 U.S., at page 404 of 76 S.Ct.): "Further, a narrow reading of the term 'representative' would substantially defeat the congressional purpose. In 1946 Congress was disturbed by the demands of certain unions that the employers contribute to 'welfare funds' which were in the sole control of the union or its officers and could be used as the individual officers saw fit. The United Mine Workers' demand that mine operators create a welfare fund for the union by contributing 10 cents for each ton of coal mined, caused the Congress to act. The Case Bill, H.R. 4908, 79th Cong., 2d Sess., which regulated welfare funds in a manner similar to § 302 was enacted in 1946, but was vetoed by the President. The following year the Taft-Hartley Act containing § 302 was passed over another veto. But, if 'representative' means only the 'exclusive bargaining representative', the explicit limitations on welfare funds in § 302(c) (5) may be easily evaded. Payments made directly to union officials, or to other individuals as trustees, would apparently be excluded from § 302. Thus, a narrow construction would frustrate the primary intent of Congress."

In attempting to defend here the concept of "representative" expressed in the Essex case, appellees undertook to argue that the trustees of the Joint Industry Board represented some independent unit or entity separate and apart from any employees or group of employees; that the Joint Industry Board, or its Fund, was a trust, which constituted such an entity, and that it was as detached and independent of the employees as would be a board of labor conciliation or board of arbitration; or, perhaps, like a volunteer fire department set up by both employers and employees in a company town.

This argument overlooks the special and peculiar provisions of this so-called trust agreement. It is a bit difficult to find that any true trust was here established, but we need not pass upon that question. For the whole agreement repeatedly specified that in all actions taken, the union members of the board were required to act separately, by their own majority, and that they were always and at all times subject to recall or discharge at the will of the union. No action whatever can be taken and none of the powers specified can be exercised unless decision is made "by a majority vote of union members." This meant that the individual members of the Board could not act independently or exercise an independent judgment or act as representatives of a separate entity or organization. The Board could not take action by a majority vote. Action could be taken only if the union members as such, by a majority of those representing the union, agreed to it. In short, these members, who had to vote in that manner were compelled to take orders from the union. Without a vote taken in that manner the Joint Industry Board could do nothing, and it was to this extent a mere adjunct of the union.[8] It is plain that Local 75 so construed the "trust agreement", for it was the union that forced these plaintiffs to pay the 2½ cents per hour by threat of strike, thus treating the Joint Industry Board as if it were a feature of the union itself.

We conclude that these payments to the Joint Industry Board fund were unlawful under subdivisions (a) and (b) of § 302 (29 U.S.C.A. § 186(a) and (b)), and that the allegations of the complaint, plus the stipulations of the parties, set forth facts sufficient to entitle the plaintiffs to an injunction against further demand.

The judgment is reversed and the cause remanded for further proceedings not inconsistent with this opinion.

---

8. Let us suppose that under the addenda to the Local 75 contract a dispute arising under that agreement concerning wage rates being paid the employees brought from San Francisco were referred to the Joint Industry Board, and that after such reference it were proposed that the point made by the employer be conceded. Such concession could only be made by union action through vote of a majority of the union members.