LOCAL NO. 2 OF the OPERATIVE PLASTERERS AND CEMENT MASONS INTERNATIONAL ASSOCIATION, etc., et al., Appellants,

v.

PARAMOUNT PLASTERING, INC., et al., Appellees.

No. 17572.

United States Court of Appeals
Ninth Circuit.

Nov. 7, 1962.

Brundage, Neyhart, Grodin & Miller, Eugene Miller and Charles Hackler, Los Angeles, Cal., for appellants Local No. 2 etc.

Mantalica, Barclay & Teegarden, and Lewis C. Teegarden, Los Angeles, Cal., for appellants Employers & Southern California Plastering Institute Inc.

Earl Klein, Beverly Hills, Cal., for appellees.

Axel W. Oxholm and Betty J. Southard, Washington, D. C., amicus curiae National Bureau for Lathing & Plastering, Inc

Bert E. Kragen, San Francisco, Cal., and Ziskind & Ross, Los Angeles, Cal., amici curiae Painting & Decorating Contractors of California, Inc.

Ziskind & Ross, Los Angeles, Cal., amici curiae Painting & Decorating Contractors Association of Los Angeles, Inc.

Alexander H. Schullman, Los Angeles, Cal., amici curiae District Council No. 36 of the Brotherhood of Painters, Decorators & Paperhangers of America.

Ziskind & Ross, and Alexander H. Schullman, Los Angeles, Cal., amici curiae Los Angeles County Painting & Decorating Joint Committee, Inc.

Before STEPHENS, BARNES and JERTBERG, Circuit Judges.

BARNES, Circuit Judge.

This is an action for declaratory and injunctive relief under the provisions of Section 302 of the Labor Management Relations Act, as amended (hereinafter referred to as the LMRA). Jurisdiction existed below as to the injunctive relief sought (Subdivision (e) of Section 302, 29 U.S.C. § 186(e)); and on appeal lies here (28 U.S.C. § 1291).

The declaratory relief sought rests on the provisions of 28 U.S.C. §§ 2201 and 2202, so long as jurisdiction is conferred by 29 U.S.C. § 186(e). We consider and hold this controversy a real and substantial controversy admitting of specific relief through a decree of conclusive character, and not an opinion advising what the law would be on a hypothetical state of facts. Samuel Goldwyn, Inc. v. United Artists Corp., 3 Cir., 1940, 113 F.2d 703.

The action originally was one for an injunction only, filed by certain employers engaged in the lathing and plastering business in the State of California. These plaintiff employers had signed, in June 1959, identical collective bargaining agreements with defendant unions. Each agreed to abide by the terms of an agreement made on January 2, 1958, between defendant The Contracting Plasterer's Association of Southern California, Inc., and the defendant unions; and any new

agreement between said last named parties.

Thereafter The Contracting Plasterer's Association of Southern California, Inc. and the defendant unions signed a new collective bargaining agreement. Some plaintiffs signed the new agreement.

The new agreement contained the following provisions, in pertinent part, in Article VI:

"B. Southern California Plastering Institute Industry Program

"1. The Trust Agreement of the Southern California Plastering Institute Industry Program, as amended and modified, is a part hereof as though fully set forth herein.

"2. The Contractors covered by this Agreement, in addition to compliance with all other provisions contained herein, shall pay to the Southern California Plastering Institute Industry Program, or its order, the sum of Four and Three-Fourths Cents (4¾¢) for each hour a man is to receive pay pursuant to the terms of this Contract.

"3. The Southern California Plastering Institute Industry Program may require payments to be made directly to it or may designate by written order an agent for deposit or collection. In the event no such agent or depository is named, said sums shall be paid to the Southern California Plastering Institute Trust for the benefit of the Southern California Plastering Institute Industry Program.

"C. Southern California Plastering Institute Trust

"1. The Southern California Plastering Institute Trust, herein referred to as the Institute Trust, shall continue in existence for the purpose of collecting such sums as are due the various Trusts which are part of this Agreement, and to pay over to said Trust such sums as are collected. The Trust Agreement of the Southern California Plastering Institute Trust, as amended and modified, is

made a part hereof as though fully set forth herein.

\* \* \* \* \* \*

"E. Labor-Management Relations Trust

"1. The Trust Agreement of the Labor-Management Relations Trust is made a part hereof as though fully set forth herein.

"2. The Contractors covered by this Agreement, in addition to compliance with all other provisions contained herein, shall pay to the Labor-Management Relations Trust, or its order, the sum of One-Fourth Cent (¼¢) for each hour a man is to receive pay.

"3. The Labor-Management Relations Trust may require payments to be made directly to it or may designate by written order an agent for deposit or collection. In the event no such agent or depository is named, said sums shall be paid to the Southern California Plastering Institute Trust for the benefit of the Labor-Management Relations Trust." [1]

Plaintiffs below urged that the three Trust Agreements mentioned (B, C and E, supra) were void, invalid and violative of the terms of the Labor Relations Act of 1947, as amended in 1959, in that: (1) they provided for payments by employers to representatives of employees of plaintiffs; (2) that moneys so paid were used for purposes other than those permitted under subsection (c) of § 302 of the LMRA.

As amended in 1959, 29 U.S.C. § 186(c) (5)[2] which proscribed payments, contained an exemption "with respect to money \* \* \* paid to a trust fund established \* \* \* for the sole and exclusive benefit of the employees \* \* \*, and their families and dependents \* \* \*: *provided,*"

"That (A) such payments are held in trust \* \* \* for medical or hospital care, pensions \* \* \*,

[workmen's] compensation \* \* \* or insurance \* \* \* or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; \* \* \*."

Section 302(c) (6) provides a second exemption—

" \* \* \* with respect to money \* \* \* paid by any employer to a trust fund \* \* \* for the purpose of pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs."

As to both exemption (5) and (6), supra, clause (B) of § 302(c) (5) was specifically made applicable, requiring that "written agreements" were essential, as well as "equal" representation between employers and employees in the administration of such fund, with an impartial umpire to be agreed upon in the event of a deadlock; for annual audits, and for open inspection of the accounts.

Subsequent to the filing of the original complaint, a supplemental complaint was filed. It added a second cause of action for declaratory relief seeking to hold invalid the trust which had evolved, since the filing of the original complaint, by reason of the transfer to the trustee (a California non-profit corporation, The Southern California Plastering Institute, Inc.) of all the functions of the three trusts hereinbefore described.

According to the allegations of the supplemental complaint, the articles of incorporation did not designate the members of the corporation but the By-laws, adopted on February 13, 1961, designated eight locals of various unions and two corporations representing employers as members. The voting rights of the members are divided as follows: Local 2 of the Operative Plasterers & Cement Masons International Association, A. F. L., 3 directors; Local 194 of the same union, 1 director; Local 400, 1 director; Local 489, 2 directors; Local 343, 1 director; Local

---

1. Article VI also contained paragraph A, relating to payments into an insurance program; paragraph D, relating to payments into a pension trust fund; and paragraph F, relating to a vacation plan. Such funds are not here involved.

2. Section 302(c) (5) of the LMRA.

739, 2 directors; Local 838, 1 director; Local 42 of Wood, Wire and Metal Lathers International Union, A. F. L., 1 director; Contracting Plasterers Association of Southern California, 11 directors; Lathing and Metal Furring Contractors Association of California, Inc., 1 director.

The answers of the defendants to the complaint and the supplemental complaint admitted the main facts, the existence of the original trust agreements and the assumption of its functions by the corporation in the collective bargaining agreement between the employers and the unions. The denials related merely to the validity and legality of the transaction. The answers to the supplemental complaint asserted that "the Southern California Plastering Institute, Inc. was incorporated for the purposes set forth in said Articles of Incorporation and for the purpose of creating an entity whose acts, conduct and operations would not lie within the proscriptions of any of the sections of the Labor-Management Relations Act." Also that the original defendants: "are not now collecting monies from plaintiffs or other contractors; that the defendant Southern California Plastering, Inc. is the only defendant now authorized to collect money from plaintiffs or other contractors."

Union appellants state three questions are here involved:

1. Did Congress intend, by the exceptions in subdivision (c) of § 302 of the LMRA to limit the type of funds which could be jointly administered by labor and management?

2. Does a trust or corporation become a "representative" of employees, within the meaning of § 302 merely because one-half of the trustees of the trust and one-half of the directors of the corporation are appointed by a labor organization where the purposes of said trusts or corporation are limited to promoting the use of lath and plaster in the construction industry?

3. Are payments by employers to such trusts and corporations within the prohibition of (a) and (b) of § 302?

Appellants Employers and Southern California Plastering Institute agree that the first two questions hereinabove mentioned are those here involved. (An affirmative answer to the third question raised above necessarily follows if questions one and two are answered affirmatively.)

Amicus Curiae National Bureau For Lathing and Plastering, Inc., a corporation, urges the same first two questions, and adds a fourth: "Whether the District Court's interpretation of Section 302, if allowed to stand, results in a denial of due process, in that the interpretation renders the section void for vagueness."

An Amici Curiae brief is also before us from Painting and Decorating Contractors of California, Inc., Painting and Decorating Contractors Association of Los Angeles, Inc., District Council No. 36 of the Brotherhood of Painters, Decorators & Paperhangers of America, Los Angeles County Painting and Decorating Joint Committee, Inc. It urges that the district court's application of § 302 to the facts of this case is unconstitutional; inconsistent with the remainder of the LMRA; and contrary to the express intent of Congress, and that the Southern California Plastering Institute is not a "representative of employees."

Appellees agree as to the first question raised by appellants, treat the second question in two separate arguments (as to the "joint trusts" and the "corporation"), and raise a fifth issue: "Should a corporate entity set up for the express purpose of evading the provisions of Section 302 be disregarded?"

We need not reach the fifth question raised by appellees, because in our view the earlier questions raised control the case. We therefore accept the union appellants' statement of the questions involved, plus the due process question.

 We answer the first three questions so raised affirmatively, and the fourth negatively. Congress did intend to limit the type of funds which could be jointly administered; both the trusts and the corporation created here are "rep-

resentatives of employees;" the payments sought to be halted by plaintiffs are within the prohibition of § 302(a) and (b) of the Act, and not within the exemptions contained in § 302(c); and the district court's interpretation of § 302 does not render the section void for vagueness, nor does it result in a denial of due process.

Congress, in passing the 1959 amendments to the LMRA, acted, as appellees state, "very cautiously." Let us assume, arguendo, that the trusts originally created are not here involved, by mootness. We then have a corporation, Southern California Plastering Institute, Inc., organized, as the district court described it:

" * * * as a general non-profit corporation under the non-profit corporation law of the State of California. California Corporations Code, § 9000 et seq.

"The objects stated in the Articles of Incorporation were these:

"(a) To promote industry betterment and industry public relations for the lathing and plastering industry.

"(b) To encourage harmony between labor and management within the lathing and plastering industry.

"(c) To carry out appropriate programs of public relations for the general welfare and advancement of the lathing and plastering industry.

"(d) To gather and distribute facts, data and other information relative to the use and benefits of lath and plaster in general for the use and benefit of its members, the lathing and plastering industry as a whole and for public dissemination.

"(e) To engage generally in any causes or objects similar to the foregoing in order to promote the lathing and plastering industry.

"(f) To adopt By-laws prescribing the duties of the officers and agents of the corporation, the detail of its organization, the time and manner of its meetings, and any and all detail incident to its meetings and conduct and management of its organization.

"(g) To do any and all things which a natural person may do necessary or desirable for the general purpose for which the corporation is organized.

"These objects are well within the purposes authorized by California law for non-profit corporations. * * * *"

The district court then disposed of the question raised below by appellees as to whether the Southern California Plastering Institute, Inc. "[was] engaging in the trust business without authorization." Such a question, ruled the district court, is one to be ruled upon only by the State of California.

"[T]he State is the only power that can intervene to determine the truth of these allegations and take appropriate action, either by quo warranto or other authorized proceedings. California Financial Code, §§ 3111–3132. We cannot usurp that State function under the guise of a declaration of rights."
We agree.

We next compare the laudable purpose of the non-profit corporation with the restrictions contained in the LMRA as to what funds can be set up and used. Did the original three trust funds and the later corporation perform functions forbidden by the Act? We quote with approval from Judge Yankwich's decision below:

"The clause [§ 302(c) (5) and (6)] is an exception to the general provisions of the section, the aim of which is to proscribe the payment by employers and receipt by employee representatives in industries affecting commerce of bribes, gifts and gratuities, and to control monies paid into union trust funds as 'war chests' or for other purposes.

"After the adoption of the statute (Taft-Hartley) so many variant interpretations, allegedly drawn from its history, were asserted that Judge

184

Learned Hand in a dissent in a noted case, United States v. Ryan, 2 Cir., 1955, 225 F.2d 417, complained that he found 'it impossible to extract any safe principles'. At page 427. The Supreme Court * * * granted certiorari in that case and its decision has become the guide to the meaning of the section. Especially insofar as it relates to the prohibition against payment to 'representatives' of the union. The entire clause as it stood before the 1959 amendment is printed in the margin [note].

"The important part of the Ryan decision, so far as it concerns this case, is contained in the following statement as to the scope of the exceptions: 'Nor can it be contended that in this legislation Congress was aiming solely at the welfare fund problem. Such a suggestion is supported neither by the legislative history nor the structure of the section. The arrangement of § 302 is such that the only reference to welfare funds is contained in § 302(c) (5). If Congress intended to deal with that problem alone, it could have done so directly, without writing a broad prohibition in subsection (a) and (b) *and five specific exceptions thereto in subsection (c), only the last of which covers welfare funds.* As the statute reads, it appears to be a criminal provision, malum prohibitum, which outlaws all payments, with stated exceptions, between employer and representative.' United States v. Ryan, supra, 350 U.S. 299, at page 305, 76 S.Ct. 400, at page 404, 100 L.Ed. 335. (Emphasis added)

"As I read this extract it means just this, that subsection 5 is a declaration of the Congress that only welfare funds *coming within one* of *the five (now six) exceptions* are exempt from the sweep of congressional condemnation. Subsequent decisions of the Supreme Court confirm this view. [Emphasis by Judge Yankwich.]

"In National Labor Relations Board v. Cabot Carbon Co., 1959, 360 U.S. 203, 79 S.Ct. 1015, 3 L.Ed.2d 1175, the high Court upheld the ruling of the National Labor Relations Board to the effect that a 'committee' of employees which deal with employers was forbidden by the Act, despite the insistence that 'to hold these employee committees to be labor organizations would *prevent employers and employees from discussing matters of mutual interest concerning the employment relationship.*' 360 U.S. at page 218, 79 S.Ct. at page 1024. (Emphasis added) To this the Court answered: 'The principal distinction lies in the unfettered power of the former to insist upon its requests. [National] Labor Relations Board v. Jas. H. Matthews & Co., 3 Cir., 156 F.2d 706, 708. Whether those proposals and requests by the Committees, and respondents' consideration of and action upon them, do or do not constitute "the usual concept of collective bargaining" (256 F.2d [281], at page 285), we think that those activities establish that the Committees were "dealing with" respondents, with respect to those subjects, within the meaning of § 2(5) [of the National Labor Relations Act].' 360 U.S. at page 214, 79 S.Ct. at page 1022.

"In Arroyo v. United States, 1959, 359 U.S. 419, 79 S.Ct. 864, 3 L.Ed.2d 915, the majority of the court held that in enacting the section the Congress were concerned with corruption of collective bargaining through bribery of employees representatives by employers and 'with the possible abuse by union officers of the power which they might achieve *if welfare funds were left to their sole control.*' 359 U.S. at page 426, 79 S.Ct. at page 868. (Emphasis added)

"I take these statements to mean that the *only* purposes for which joint administrative committees of employers and employees, *working with-*

*in the framework of the Labor Management Relations Act,* [emphasis by Judge Yankwich] could act were those coming within the exceptions. This interpretation is confirmed by the added statement contained in the opinion: 'Congress believed that if welfare funds were established which did not define with specificity the benefits payable thereunder, a substantial danger existed that such funds might be employed to perpetrate control of union officers, for political purposes, or even for personal gain. See 92 Cong.Rec. 4892–4894, 4899, 5181, 5345–5346; S.Rep. No. 105, 80th Cong., 1st Sess., at 52; 93 Cong.Rec. 4678, 4746–4747. To remove these dangers, specific standards were established to assure *that welfare funds would be established only for purposes which Congress considered proper* and expended only for the purposes for which they were established. See Cox, Some Aspects of the Labor Management Relations Act, 1947, 61 Harv.L.Rev. 274, 290. *Continuing compliance with these standards in the administration of welfare funds was made explicitly enforceable in federal district courts by civil proceedings under § 302(e).'* 359 U.S. at pages 426–427, 79 S.Ct. at page 868. (Emphasis added) [note]

"The conclusion is reenforced by the statement in a later case, Lewis v. Benedict Coal Corp., 1960, 361 U.S. 459, 80 S.Ct. 489, 4 L.Ed.2d 442, which reads: 'The provisions of the collective bargaining agreement creating the fund included the express provision that "this Fund is an irrevocable trust created pursuant to Section 302(c) of the 'Labor-Management Relations Act, 1947.' " Another provision specifies that the purposes of the fund shall be all purposes *"provided for or permitted in Section 302(c)."* In this way the agreement plainly declares what the statute requires, namely, that the fund shall be used "for the sole and exclusive benefit" of the employees, their families and dependents.' 361 U.S. at pages 464–465, 80 S.Ct. at page 493.

"All cases interpreting this clause which have arisen since the decision in Ryan, supra, must be read in the light of its declarations and those contained in subsequent cases as to the scope of the limitations on the nature of trust funds. So read they warrant the conclusion that *the only* trust funds permitted are those in the six categories now contained within the exceptions. [Emphasis by Judge Yankwich.]

"In the light of this, the contention of the defendants that the clause under discussion does not prohibit joint administration of trust funds, if they are established for other purposes than dealing with the employers 'concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work' (29 U.S.C.A., § 152(5)) cannot be sustained."

Judge Yankwich then differentiated Conditioned Air & Refrigeration Co. v. Plumbing & Pipe Fitting Labor-Management Relations Trusts, D.C.Cal.1956, 159 F.Supp. 887, affirmed, 9 Cir., 253 F.2d 427, and Sheet Metal Contractors Association of San Francisco v. Sheet Metal Workers International Association, 9 Cir., 1957, 248 F.2d 307. He cited Copra v. Suro, 1 Cir., 1956, 236 F.2d 107, and Employing Plasterers' Association of Chicago v. Journeymen Plasterers' Protective & Benevolent Society of Chicago, 7 Cir., 1960, 279 F.2d 92, as supporting his conclusions. He quoted from Mechanical Contractors Association of Philadelphia v. Local Union No. 420, 3 Cir., 1959, 265 F.2d 607:

" 'Thus, the essence of Section 302 may be summarized as follows: No fund derived from employer contributions may be administered by persons designated by a union *unless the fund meets the standards set forth in Section 302(c) (5). Any employee-designee administering such fund not*

*meeting the requirements of Section 302(c) (5) is a "representative" within the meaning of Subsections 302(a) and (b).* As was stated in United States v. Ryan, 350 U.S. at page 305, 76 S.Ct. at page 404, "if 'representative' means only the 'exclusive bargaining representative,' the explicit limitations on welfare funds in § 302(c) (5) may be easily evaded. Payments made directly to union officials, *or to other individuals as trustees,* would apparently be excluded from § 302. Thus, a narrow construction would frustrate the primary intent of Congress." (Emphasis supplied.).' "

and,

" 'As was stated by Judge Hand in his dissenting opinion in United States v. Ryan, 2 Cir., 1955, 225 F.2d 417, 425, subsequently adopted by the Supreme Court, "Since * * * the purpose of subsection (c) is to state exceptions to the preceding subsections (a) and (b), the payments that subsection (c) covers would fall within (a) and (b) except for the exception." ' * * * (Emphasis added)"

The able trial judge then observed that the restrictive interpretation of § 302(c) (5) was aided by the addition of § 302(c) (6) in 1959 (73 Stat. 537) covering pooled vacations, etc. Costs of apprenticeship training had been held a lawful purpose in South Louisiana Chapter, Inc. v. Local Union No. 130 of the Int. Brotherhood of Electrical Workers, E.D.La.1959, 177 F.Supp. 432; that "Congress * * * has been required to spell out its intent in order that courts will not strike down, as illegal, labor and management-agreements, such as the one in suit, which promote harmony in an industry and redound to the benefit of the employer and employee alike."

But until Congress has spelled out such an intent, with respect to the activities specifically exempted, it is not the function of the courts to create additional exemptions. Such would be the result of a single court's belief as to what will or

will not "promote harmony" and "redound to the benefit of the employer and employee alike." This court can believe that Congress might well have, or even *should have, provided additional exemptions,* permitting the setting up of laudable trusts that are vital to the preservation of the economic position of both labor and management, yet this court cannot be the arbiter of what such exemptions should be. That is the duty and responsibility of Congress. As Judge Yankwich ruled: Congress proscribed certain practices and permitted others in labor-management agreements, and permitted "joint trust funds for certain purposes only."

It is perfectly true, as the union contends, that there is not the slightest hint in the record that any of the trust funds here involved "has resulted in bribes, kickbacks, slush funds, racketeering or union war chests; nor do [plaintiffs] assert that this fund is under the sole control of the union." We accept that statement, with gratitude and happiness that it is true. But that does not prove that the trust fund is "not within the scope of the evil which Congress intended to eliminate." We agree with appellees and Employing Plasterers' Association of Chicago v. Journeyman Plasterers' Protective & Benevolent Society of Chicago, supra, wherein the court stated:

"Section 302 is aimed primarily at the *prevention* of possible abuse and not at providing a remedy for abuse actually perpetrated. * * * Where it is established that payment and acceptance is between employer and 'representatives' of employees, the issue in a suit for injunction becomes the legality of the welfare funds *as measured by the statutory standards* of administration." (279 F.2d at 97.) (Emphasis added.)

Gibas v. United States, 7 Cir., 1962, 300 F.2d 836, 840.

Appellants urge that this "good purpose" of the funds so paid was but of *indirect* benefit to the employees, and not to their direct benefit. We find in the

statute no language creating or recognizing such a distinction.

Judge Yankwich did not find it necessary to reach the differences between the powers and voting rights of the trustees of the original trusts, and those of the directors of the non-profit corporation. This because, in his opinion, the *purposes*, both of the trusts and the corporation, violated the collective bargaining agreement they were to implement.

Are these trust funds, and more particularly, is this non-profit corporation, a "representative" of the employees of a labor organization? Appellants admit that the trade promotion funds herein involved are not within any of the exceptions of subsection (c) of § 302. But they earnestly urge that neither are such funds within the proscription of § 302(a) and (b) because the payments are not made to a "representative of employees."

We agree with appellants that the factual situation here is not precisely comparable to that in the Sheet Metal Contractors Association case, supra, where the trustee, a Joint-Industry Board, aided disputes between labor and management arising from a collective bargaining agreement, set up arbitration committees, a forum to discuss the problems of the industry, and "cooperated" with "public bodies" with respect to legislation.

The Board in the Sheet Metal case, supra, had the authority and power "to study and correct improper working conditions and shall decide all controversies or disputes arising under this agreement." This court concluded: "The purposes of the Board, indicate that it existed for the purpose at least in part of dealing with employers concerning grievances, etc." Our opinion presumed that "any dispute" between the parties to the

agreement included "grievances," and concluded that the Joint-Industry Board satisfies the definition of "labor organization" contained in the original Wagner Act (29 U.S.C. § 152(5)).[3] Here there was undisputed employee participation in a plan. If it existed, even in small part, for the purpose of dealing with employers concerning grievances or disputes, or conditions of work, it was then a "labor organization" within the 29 U.S.C. § 152(5) definition, and could be a "representative" within the 29 U.S.C. § 152(4) definition.[4]

We now turn to the purposes of the corporation, and the antecedent trusts. Plaintiffs' Exhibit 2, "Agreements and Declarations of Trust," indicates that six separate agreements were signed by the same parties on behalf of labor, and the same parties on behalf of management.

First: There was the "Southern California Plastering Institute Trust." It was the collecting agency for (a) the Insurance Trust; (b) the Industry Program; (c) the Pension Trust; and (d) the Labor-Management Relations Trust.

There was also (e) a Vacation Plan with a Vacation Fund Account to which amounts were payable under the collective bargaining agreements. The trustees of Southern California Plastering Institute acted as trustees for this fund.

As quoted above, the only trusts herein attacked were the Industry Program, the Institute Trust, and the Labor-Management Relations Trust. No question is raised as to the Vacation Plan, the Insurance Trust or the Pension Trust.

The agreements setting up the respective trusts were all made a part of the collective bargaining agreement, "as though set forth in full." The Institute

3. Which reads: "The term 'labor organization' means any organization of any kind, or any agency or employee representation committee *or plan*, in which employees participate and which exists for the purpose, in whole *or in part*, of dealing with employers concerning grievances, labor disputes, wages, rate of pay, hours of employment, or conditions of work." (Emphasis added.)

4. Which reads: "The term 'representatives' includes *any* individual or labor organization." (Emphasis added.)

Trust had no purpose other than to act as a conduit for the moneys collected on their way to the other trusts.

### 5. "ARTICLE V
#### "FUNCTIONS AND POWERS

"A. The trustees shall have full power to select and carry out as they deem appropriate a program of public relations for the general welfare and advancement of the plastering industry, and shall assume existing contracts and liabilities of the Industry Program as previously carried on by the Southern California Plastering Institute.

"B. The Industry Program shall continue to pay to the National Bureau of Lathing and Plastering, Washington, D. C. so long as said organization qualifies as a business league under the provisions of Section 501(c) (6) of Internal Revenue Code of 1954, the sum of ½¢ of each 4¾¢ received by the Industry Program for the purpose of improvement of business conditions of the lathing and plastering industry, but in no event shall this sum exceed $400 per week.

"C. The Industry Trust shall have the right and power to receive payments from sources other than those provided in this contract for the purposes of trade promotion and advertising.

"D. The Southern California Plastering Institute Industry Program may require payments to be made directly to it or may designate by written order an agent for deposit or collection. In the event no such agent or depository is named, said sums shall be paid to the Southern California Plastering Institute Trust for the benefit of the Industry Program.

"E. The trustees of the Industry Program are hereby empowered to delegate to the Insurance Program the maintenance and operation of the office, personnel and records of the Industry Program. In such event the Industry Program shall pay that portion of the expense of said operation which is fair and reasonably attributable to the Industry Program in the opinion of the trustees.

"F. The trustees shall have the power to do all things necessary to collect and receive funds due to the Industry Program by the terms of the labor agreement, addendum and modifications thereto, including the right to sue to recover said payments and costs of suit.

"G. Without prejudice to the rights of the parties under the collective bargaining agreements with respect to their enforcement, The Board of Trustees shall have the power to enforce the payment of contributions to the trust by individual

Second: We find the Industry Program trust had certain stated purposes, functions and powers.[5]

employers under the terms of the collective bargaining agreements or under any other promise to make such payments in any particular case or cases only where such action is specifically authorized by a resolution of the Board. If any individual employer defaults in the making of such payments and if the Board consults legal counsel with respect thereto, or files any suit or claim with respect thereto, there shall be added to the obligation of the employer who is in default, reasonable attorneys' fees, court costs and all other reasonable expenses incurred by the Board in connection with such default.

"H. The Board of Trustees shall procure fidelity bonds for each trustee or other person authorized to handle, deal with, or draw upon the moneys in the trust for any purpose whatsoever, said bonds to be in such reasonable amount and to be obtained from such source as the Board shall determine.

"I. The Board of Trustees shall have power to authorize one person to sign checks drawn on the trust in amounts not exceeding $500. Except as covered by such authority, all checks, drafts, vouchers or other withdrawals, of money from the trust shall be authorized in writing or countersigned by at least one trustee who is an employer representative and one trustee who is an employee representative.

"J. The Board of Trustees shall maintain suitable and adequate records of and for the administration of the trust and all business relations thereto. The Board may require the employers, any individual employer, the union, and any individual employee to submit to it any information, data, report or documents reasonably relevant and suitable for the purposes of such administration. The parties agree that they will use their best efforts to secure compliance with any reasonable request of the board for any such information, data, report or documents.

"K. The trustees shall cause to be made an annual audit of the trust by a C.P.A. and shall make available to all interested persons a statement of the results of such audit at the principal office of the trust, and at such other places from time to time designated by the trustees.

"L. No contractor actively engaged in the plastering business, no union official or business agent of the contracting unions, and no trustee of the trust shall be employed by said trust.

The purpose was to promote "industry betterment and industry public relations." The trustees were equally divided between the contractors and the union. (Art. III, ¶ B.) Under Article V, ¶ A, the trustees had full power to carry out, as they deemed appropriate, a program of public relations for the general welfare and advancement of the plastering industry. Under Article V, ¶ M, the trustees could employ counsel, and executive, administrative, clerical and secretarial help, and incur and pay any other expense reasonably incidental to the administration of the trust.

"M. The Board of Trustees shall have power:

"1. To establish and accumulate such reserve funds as may be necessary to provide for administration expenses and other proper obligations of the trust.

"2. To employ such executive, administrative, clerical, secretarial and legal personnel and other employees and assistants as may be necessary in connection with the administration of the trust, and to pay or cause to be paid, out of the trust, the compensation and expenses of such personnel and assistants, the cost of office space, furnishings and supplies and other essentials required in such administration.

"3. To consult with and secure the advice of legal counsel on any question of fact or law arising in connection with the administration of the trust, including, at the request of either the employer trustees or the union trustees, advice on any question from legal counsel selected by the employer trustees and legal counsel selected by the union trustees who shall be directed to confer with each other and, if possible, submit a joint opinion to the Board, and in like manner to employ legal counsel or joint legal counsel in connection with suits or claims by or against the Board of the trust with respect to the trust, and to pay the reasonable costs of such legal services from the trust.

"4. To incur and pay out of the trust any other expense reasonably incidental to the establishment and administration of the trust. To carry on all its functions under the name of Southern California Plastering Institute Industry Program and to carry any and all bank accounts in a trust fund under that name.

"5. To invest and reinvest such portion of the trust as is not required for current expenditures and charges in such securi-

Under Article V, ¶ G, the trustees had the power "to enforce the payment of contributions to the trust by individual employers under the terms of the collective bargaining agreements or under any other promise to make such payments." Under Article V, ¶ J, the trustees had the power to require employers to submit any "information, data, report or documents reasonably relevant" to the administration of the trust.

Third: Under the Labor-Management Relations Trust created by the collective bargaining agreement, the functions and powers [6] of the six trustees (three ap-

ties as are legal for the investment of trust funds under the laws of the State of California.

"6. To adopt rules and regulations for the administration of the trust which are not inconsistent with the purpose and intent of this agreement."

6. "ARTICLE IV
"FUNCTIONS AND POWERS

"A. It shall be the function of the Trustees, and the Trustees shall have the power to expend the funds of the Trust for the common interest of labor-management relations of the parties to the Collective Bargaining Agreement, for the printing of necessary forms and documents required to facilitate the said Agreement, the printing of said Agreement and any amendments and addendum thereto, for secretarial or reporter's services required for meetings of labor-management negotiating committees, for legal services and other costs incurred by management-employed counsel, such as consultation, attendance at meetings, drafting of documents and litigation related to matters pertaining to said Agreement, and for other incidental costs and expenses of labor-management relations. None of the Trust Fund shall be used for any purpose contrary to or inimical to the Union or to the Contractor parties to the Collective Bargaining Agreement.

"B. The Labor Relations Trust may require payments to be made directly to it or may designate by written order an agent for deposit or collection. In the event no such agent or depository is named, said sums shall be paid to the Southern California Plastering Institute Trust for the benefit of the Labor Relations Trust.

"C. The Trustees shall have the power to do all things necessary to collect and receive funds due to the Labor Relations Trust.

pointed by the unions, and three by the contractors) were "to expend the funds * * * for the common interest of la-bor-management relations * * * for secretarial or reporter's services required for meetings of labor-manage-

Trust by the terms of the Labor Agreement, addendum and modifications thereto, including the right to sue to recover said payments and costs of suit.

"D. Without prejudice to the rights of the parties under the Collective Bargaining Agreements with respect to their enforcement, the Board of Trustees shall have the power to enforce the payment of contributions to the Trust by individual employers under the terms of the Collective Bargaining Agreements or under any other promise to make such payments in any particular case or cases only where such action is specifically authorized by a resolution of the Board. If any individual employer defaults in the making of such payments and if the Board consults legal counsel with respect thereto, or files any suit or claim with respect thereto, there shall be added to the obligation of the employer who is in default, reasonable attorneys' fees, court costs and all other reasonable expenses incurred by the Board in connection with such default.

"E. The Board of Trustees shall procure fidelity bonds for each Trustee or other person authorized to handle, deal with, or draw upon the moneys in the Trust for any purpose whatsoever, said bonds to be in such reasonable amount and to be obtained from such source as the Board shall determine.

"F. The Board of Trustees shall have power to authorize one person to sign checks drawn on the Trust in amounts not exceeding $500. Except as covered by such authority, all checks, drafts, vouchers or other withdrawals of money from the Trust shall be authorized in writing or countersigned by at least one Trustee who is an employer representative and one Trustee who is an employee representative.

"G. The Board of Trustees shall maintain suitable and adequate records of and for the administration of the Trust and all business relations thereto. The Board may require the Employers, any individual Employer, the Union, and any individual employee to submit to it any information, data, report or documents reasonably relevant and suitable for the purposes of such administration. The parties agree that they will use their best efforts to secure compliance with any reasonable request of the Board for any such information, data, report or documents.

"H. The Trustees shall cause to be made an annual audit of the Trust by a C.P.A. and shall make available to all interested persons a statement of the results of such audit at the principal office of the Trust, and at such other places from time to time designated by the Trustees.

"I. No contractor actively engaged in the plastering business, no union official or business agent of the contracting unions, and no Trustee of the Trust shall be employed by said Trust.

"J. The Board of Trustees shall have power:

"1. To establish and accumulate such reserve funds as may be necessary to provide for administration expenses and other proper obligations of the Trust.

"2. To employ such executive, administrative, clerical, secretarial and legal personnel and other employees and assistants as may be necessary in connection with the administration of the Trust, and to pay or cause to be paid, out of the Trust, the compensation and expenses of such personnel and assistants, the cost of office space, furnishings and supplies and other essentials required in such administration.

"3. To consult with and secure the advice of legal counsel on any question of fact or law arising in connection with the administration of the Trust, including, at the request of either the Employer Trustees or the Union Trustees, advice on any question from legal counsel selected by the Employer Trustees and legal counsel selected by the Union Trustees who shall be directed to confer with each other and, if possible, submit a joint opinion to the Board, and in like manner to employ legal counsel or joint legal counsel in connection with suits or claims by or against the Board or the Trust with respect to the Trust, and to pay the reasonable costs of such legal services from the Trust.

"4. To incur and pay out of the Trust any other expense reasonably incidental to the establishment and administration of the Trust. To carry on all of its functions under the name of Labor-Management Relations Trust and to carry any and all bank accounts in a trust fund under that name.

"5. To invest and reinvest such portion of the Trust as is not required for current expenditures and charges in such securities as are legal for the investment of trust funds under the laws of the State of California.

ment negotiating committees, for legal services and other costs * * * pertaining to said [Collective Bargaining] Agreement, and for other incidental costs and expenses of labor-management relations." The Trustees had under Article IV, ¶ J, similar powers to those of the Industry Program Trustees mentioned above.

It should be noted generally that in the Industry Program Trust three-fourths of the trustees constituted a quorum,[7] but a majority of all trustees (not a majority of a quorum) governed "in the determination of any matter." In the Labor-Management Relations Trust, five of the six trustees constituted a quorum,[8] but a majority of all trustees (not a majority of a quorum) governed "in the determination of any matter." Thus both labor and management maintained an absolute veto on any proposed action. Such procedure satisfies the requirement of employees' "participation." No matter could be acted upon by either trust without "employee participation." We have already ruled in Sheet Metal Contractors Association v. Sheet Metal Workers, supra, that the term "employee participation" must, like the term "representative," be given a broad and inclusive meaning. Such an interpretation is required of us by United States v. Ryan, supra.

We note that this case was decided below largely on the written evidence produced by stipulation. Oral testimony was limited, and only addressed to the question of the amount of interstate commerce, a question not raised on this appeal. The court below, therefore, had no better opportunity than we have to scrutinize witnesses.

We conclude that the evidence in this case clearly establishes that the three trusts (Industry Program, Labor-Management Relations Trust, and the Institute Trust) as well as the succeeding corporate entity, are severally "representative" of employees as that term is used in § 302(a) and (b); and that the purposes, powers and functions of the trusts and corporation here involved are not within the exemptions created by Congress, and are not permissible objects for the use of joint trust funds.[9]

We do not quarrel in the slightest with the laudable objectives of the trust amicably created by labor and management in this case. We sympathize with the efforts of both labor and management to solve a vexing industry problem. But like so many of such present day problems, our duty is to rule in accordance with that which the Congress (quote) in its wisdom (end of quote) has seen fit to enact. We cannot widen the door when the door sill has been carefully tailored by the representatives in Congress. The relief sought by the appellants herein must be found in congressional and not judicial action.

We *affirm* the judgment below.

---

"6. To adopt rules and regulations for the administration of the Trust which are not inconsistent with the purpose and intent of this Agreement."

7. Article IV, ¶ G.

8. Article III, ¶ G.

9. Nowhere has our attention been called to any attempt to comply, either in the trusts set up or the corporation, with the requirements of 29 U.S.C. § 186(c) (5) (B) with respect to the naming of neutral persons empowered to break a deadlock between trustees or directors.