Michael COSTELLO et al.,
Plaintiffs-Appellants,

v.

Barry LIPSITZ et al.,
Defendants-Appellees.

No. 75–2207.

United States Court of Appeals,
Fifth Circuit.

March 7, 1977.

**1268**

Joseph H. Kaplain, Joseph C. Segor, Richard A. Sicking, Miami, Fla., for plaintiffs-appellants.

Steadman S. Stahl, Jr., Hollywood, Fla., for defendants-appellees.

Before BROWN, Chief Judge, and TUTTLE and GEE, Circuit Judges.

1. The eight are for September 1, 1962 to August 31, 1964, October 22, 1964 to August 31, 1966, September 1, 1966 to August 31, 1967, September 1, 1967 to August 31, 1969, September 1, 1969 to August 31, 1972, September 1, 1972 to September 30, 1973, October 1, 1973 to September 30, 1974, and October 1, 1974 to September 30, 1975.

2. Article V, § 7 in the 1962 collective bargaining agreement states "The parties to this Agreement shall have a joint apprenticeship and training Trust Fund Agreement, which Agreement shall conform to Section 302 of the Labor-Management Relations Act of 1947 as amended." This provision has been put in all subsequent collective bargaining agreements including the one dated October 1, 1974.

3. Michael Costello, Charles Perez, and Robert Horan.

4. Barry Lipsitz, Robert Seiple, C. M. Schneider.

5. Section 10 and other sections relevant to § 10 of the 27 August 1962 Trust Agreement between Local 728 of IBEW and the Gold Coast Chapter of the National Electrical Contractors Association (NECA) follow.

The Employer and the Union do hereby agree as follows:

1. To establish an Apprenticeship and Training Trust Fund (hereinafter called "Trust Fund"), to be known as and administered in the name of the Gold Coast Electrical Joint Apprenticeship and Training Trust Fund.

JOHN R. BROWN, Chief Judge:

After more than a decade of operating under eight[1] collective bargaining agreements, each of which included a provision with almost identical wording requiring a Joint Apprenticeship and Training Trust Fund Agreement (Trust Fund Agreement)[2] conforming with § 302 of the Labor Management Relations Act of 1947, 29 U.S.C. § 186 (LMRA), a smoldering dispute between Union Trustees[3] and Employer Trustees[4] over one provision, Section 10,[5] of the 27 August 1962 Trust Agreement (Trust Agreement) reached a non-judicial impasse.

The whole thing turns on § 10 which provides that "[m]atters pertaining to any employees of this Fund [Trust Fund] shall be the responsibility of Employers' Trustees only". Although the contents of § 10 may be admirably succinct, it has nonetheless created a protracted conflict. As a result of repeated failures[6] spanning almost a decade to have this section of the Trust

\* \* \* \* \* \*

4. The Trust Fund shall be controlled and administered by a Board of Trustees (hereinafter called the "Trustees"), which shall consist of six (6) members, three appointed by the Employer and three appointed by the Union. Each Trustee shall be elected from the members of the Joint Apprenticeship and Training Committee, and shall continue to serve as a Trustee only as long as he remains a member of said committee. The Trustees appointed by the Employer shall at all times have three (3) votes, and the Trustees appointed by the Union shall at all times have three (3) votes, except as per item # 10, said three votes to be allocated equally among the respective Trustees in attendance. A quorum at meetings shall be two Trustees appointed by the Union and two Trustees appointed by the Employer. Votes may be submitted in writing by absentee Trustees, but such votes shall not increase the total vote of either the Union or Employer Trustees, nor be counted for the establishing of a quorum at any meeting.

\* \* \* \* \* \*

10. Matters pertaining to any employees of this Fund shall be the responsibility of the Employers Trustees only.

6. In 1967 Union Trustees' attempts to have § 10 eliminated began. Included among these efforts was a complaint to the Department of Justice in 1969 and a series of motions. At the March 1974 meeting of Trustees, a motion to rescind § 10 was made.

Agreement deleted, Union Trustees[7] sought a judicial determination under the Declaratory Judgment Act[8] that § 10 of the Trust Agreement[9] fails to meet the constraints of §§ 302(c)(5)(B) and 302(c)(6) of the LMRA.[10] In response, Employer

7. Union Trustees were and are representatives of Local No. 728, International Brotherhood of Electrical Workers of Fort Lauderdale, Florida. Employer Trustees were chosen by Florida Gold Coast Chapter of N.E.C.A., Inc. (Employer Association) and represent contractors who belong to that chapter of NECA.

8. 28 U.S.C.A. §§ 2201, 2202. Jurisdiction is also predicated on 29 U.S.C.A. § 186(e), Section 302(e) of the Labor Management Relations Act of 1947.

9. "Trust Fund Agreement" refers to the one called for in the collective bargaining agreements and "Trust Agreement" indicates the 27 August 1962 Trust Agreement.

10. 29 U.S.C. §§ 186(c)(5)(B), (c)(6).

§ 186. *Restrictions on payments and loans to employee representatives, labor organizations, officers and employees of labor organizations, and to employees or groups or committees of employees; exceptions; penalties; jurisdiction; effective date; exception of certain trust funds*

(a) It shall be unlawful for any employer or association of employers or any person who acts as a labor relations expert, adviser, or consultant to an employer or who acts in the interest of an employer to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce; or

(3) to any employee or group or committee of employees of such employer employed in an industry affecting commerce in excess of their normal compensation for the purpose of causing such employee or group or committee directly or indirectly to influence any other employees in the exercise of the right to organize and bargain collectively through representatives of their own choosing; or

(4) to any officer or employee of a labor organization engaged in an industry affecting commerce with intent to influence him in respect to any of his actions, decisions, or duties as a representative of employees or as such officer or employee of such labor organization.

\* \* \* \* \* \*

(c) The provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer to any of his employees whose established duties include acting openly for such employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer; (2) with respect to the payment or delivery of any money or other thing of value in satisfaction of a judgment of any court or a decision or award of an arbitrator or impartial chairman or in compromise, adjustment, settlement, or release of any claim, complaint, grievance, or dispute in the absence of fraud or duress; (3) with respect to the sale or purchase of an article or commodity at the prevailing market price in the regular course of business; (4) with respect to money deducted from the wages of employees in payment of membership dues in a labor organization: *Provided,* That the employer has received from each employee, *on whose account such deductions* are made, a written assignment which shall not be irrevocable for a period of more than one year, or beyond the termination date of the applicable collective agreement, whichever *occurs sooner;* (5) *with respect to money* or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents (or of such employees, *families, and* dependents jointly with the employees of other employers making similar payments, and their families and dependents): *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical or hospital care, pensions on retirement or death of employees, compensation for injuries or illness resulting from occupational activity or insurance to provide any of the foregoing, or unemployment benefits or life insurance, disability and sickness insurance, or accident insurance; (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, *and employees and employers are equally represented in the administration of such fund,* together with such neutral persons as the representatives of the employers and the representatives of employees may agree upon and in the event the employer and employee groups deadlock on the administration of such fund and there are no neutral persons empowered to break such dead-

Trustees argue that a § 302 trust does not exist and therefore equal representation in the administration of the Trust Fund is not required. Compliance with the §§ 302(c)(5)(B) and (c)(6) requirements avoids the § 302 prohibition of payments by an employer to his employees, his employees' representatives, their labor organizations, or officers or employees of such a labor organization.

After a full trial without a jury, the District Court issued its findings of fact and conclusions of law on March 31, 1975. Included among these determinations is the District Court's decision that no written Trust Fund Agreement had been executed or existed for the years 1964, 1966, 1967, 1972, 1973 and 1974.[11] Coupled with this finding is one that the trust fund in existence—known as the Gold Coast Electrical Joint Apprenticeship and Training Trust Fund (Trust Fund)—has been wholly funded by the employer and consequently the Trust Fund is " . . . not controlled by Section 302 of the Taft-Hartley Act so that the employer must give the union an equal voice in the operation of the Fund."

When the chaff of the arguments and issues presented is winnowed from the seed of this dispute, only a narrow issue remains. Has the executed 27 August 1962 Trust Agreement been ratified so all § 302 requirements must be followed?

On the basis of the uncontroverted facts in this record that a written trust agreement was executed by authorized representatives of both Union and Employers and that a Trust Fund has been created and operated in accordance with the Trust Agreement's terms from 1962 to today, we hold that the Trust Agreement has been ratified and that the Trust Fund is a valid trust within the perimeters of § 302(c)(5)(B)'s and § 302(c)(6)'s application. In view of this, § 10 of the Trust Agreement is illegal, must be eliminated from the Trust Agreement, and equal representation must exist in the administration of the Gold Coast Electrical Joint Apprenticeship and Training Trust Fund.

### Actions, Words, Or History

In pre-1962 negotiations between Union and Employer Association encompassing a period from the early 1950's,[12] the respective collective bargaining agreements have provided for a Local Joint Apprenticeship and Training Committee composed of equal numbers of management and labor representatives and requiring payments by each contractor to the Apprenticeship Program of $2.00 per month per indentured apprentice.[13] The Union was required to match the contractors' payments.

During its negotiations which culminated in the collective bargaining agreement ef-

lock, such agreement provides that the two groups shall agree on an impartial umpire to decide such dispute, or in event of their failure to agree within a reasonable length of time, an impartial umpire to decide such dispute shall, on petition of either group, be appointed by the district court of the United States for the district where the trust fund has its principal office, and shall also contain provisions for an annual audit of the trust fund, a statement of the results of which shall be available for inspection by interested persons at the principal office of the trust fund and at such other places as may be designated in such written agreement; and (C) such payments as are intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities; or (6) with respect to money or other thing of value paid by any employer to a trust fund

established by such representative for the purpose of pooled vacation, holiday, severance or similar benefits, or defraying costs of apprenticeship or other training programs: *Provided,* That the requirements of clause (B) of the proviso to clause (5) of this subsection shall apply to such trust funds. (Emphasis added).

\* \* \* \* \* \*

11. The District Court's order reads for the years 1964, 1966, 1967, 1972, 1973 and 1974. However, it is apparent that the District Court is referring to the times governed by the collective bargaining agreements beginning in the years listed.

12. A specific date is not indicated in the record, but is referred to in Union Trustee's brief only as "as far back as the early 1950's . . . ."

13. R. 130, 144.

fective on September 1, 1962, Union and Employer Association agreed to create an Apprenticeship and Training Trust Fund (Trust Fund) financed wholly by members of Employer Association. Included in the 1962 collective bargaining agreement was the provision of Article V, § 7 which states:

> "The parties to this agreement shall have a joint apprenticeship and training trust fund agreement which shall conform to Section 302 of the Labor Management Relations Act of 1947 as amended."

Each successive collective bargaining agreement has contained the same requirement. On August 27, 1962, five days prior to the actual signing of the September 1, 1962 collective bargaining agreement, the Trust Agreement was executed by Marshall Williams [14] in his representative capacity for Union and Karl Behnke as agent for Employer Association.[15]

From September 1962 forward the requisite payments have been made by Employers into the Trust Fund, succeeding collective bargaining agreements have contained the identical provision calling for a Trust Fund Agreement, and, most importantly, the conduct of the parties has demonstrated

that each believed the 27 August 1962 Trust Agreement was the one referred to in each of the collective bargaining agreements from 1962 through 1974.[16] Indeed, were it not for one provision of the 1962 Trust Agreement, § 10, this dispute would not be before this Court today.

In 1967, Union's displeasure with § 10 was piqued when its business manager, Marshall Williams, resigned and became both Chapter Manager of NECA and Executive Director of Trust Fund. In his new dual capacity, Williams' salary began at $669.23 per week with a ten percent increase each January 1 during the life of the contract. By the fifth and last year of the contract, Williams' salary would be approximately $50,000. Among the other perquisities provided was reimbursement for business connected automobile expenses at the rate of twenty cents per mile. Since 1967, Union Trustees have repeatedly and unsuccessfully attempted to have § 10 of the Trust Agreement eliminated. Finally, because of the inability to dislodge absolute control by Employer Trustees over hiring, firing, and compensation of Fund employees,[17] Union Trustees seek our resolution of this provision's legality.[18]

14. Before and during the negotiations in 1962, Mr. Williams was the business agent for Union and signed both the Trust Agreement and the collective bargaining agreement on behalf of the Union. In 1967, Williams discontinued his employment with Union and accepted the position as Executive Director of the Apprenticeship Program and Chapter Manager of NECA.

15. Article V, § 7 of the 1962 collective bargaining agreement is quoted above in note 2, *supra*. Article V, § 8 specifies the amount of payments to be made into the Trust Fund. This provision in the 1962, 1964, 1966 and 1969 collective bargaining agreements stated:

> —All employers subject to the terms of this Agreement shall contribute 2% of their gross labor payroll for the purpose of maintaining an apprenticeship and training program. This sum shall be forwarded weekly to the Trust Fund.

In the 1972 collective bargaining agreement, this provision was altered and appears as quoted in note 16, *infra* for the 1972, 1973 and 1974 collective bargaining agreements.

16. Other factors are indicative of this belief. At the time of the trial, the Trust Fund had been operating under the terms of the Trust Agreement, had accumulated approximately

$500,000, and had a staff composed of a director, assistant director, three clerical employees, a bookkeeper, and 17 instructors. Also, in the 1972 collective bargaining agreement, a change in the contractors' contributions was provided for and payments were made according to the new terms. The provision in the 1972 collective bargaining agreement providing for the change states:

> Section 8.—All Employers subject to the terms of this Agreement shall contribute one percent (1%) of their gross labor payroll for the purpose of maintaining an Apprenticeship and Training Program. This sum shall be forwarded monthly to the Trust Fund. It is further agreed that, in the event the Fund should fall below $150,000.00, the contribution shall revert to two percent (2%) until such time the Fund is increased to $250,000.00, at which time the contribution shall revert back to one percent (1%).

17. Most important are the executive director and assistant director of the Trust Fund. Also included are clerical employees of the Fund.

18. Before trial other issues were disputed, but on the day of the trial all the following, formerly disputed issues were settled by stipulation.

In resolving this dispute, this Court addresses whether a written Trust Fund Agreement exists,[19] whether the 27 August 1962 Trust Agreement has been ratified, whether a trust fund agreement in this Union Trustee-Employer Trustee dispute must conform to the dictates of § 302(c)(5)(B) and (c)(6) of the LMRA, and whether § 10 of the Trust Agreement violates these LMRA provisions.

### Misuse, Influence Peddling, Bribery

Based on these actions, on the wording of these particular writings, and the historical development of the trust fund references which exist in the collective bargaining agreements, the drama between the two groups has unfolded. In simplest terms, this case is another of the perennial replays of labor-management disputes. Although the geographical setting of this disagreement is different from other, similar ones, it is staged with the back drop of concerns which gave rise to § 302.

Because of the abuses that have occurred in the cauldron of labor-management interplay which include misuse of labor organization funds, extortion by labor personnel, and attempts by business personnel to influence or exert pressure on union "personnel" —particularly in a financial form, restrictions on conduct between these two bodies and certain of their representatives have been imposed by Congress.[20] One is the § 302(c) prohibition of payments by an employer to labor organizations or to their representatives.[21] However, in certain explicitly, statutorily defined instances exceptions to this general prohibition exist. One permits payments to a trust fund for training and apprenticeship programs.[22] For such a trust fund to come within this exception, the statutory criteria set forth in § 302(c)(5) and (c)(6) must be met.[23]

As any "curative" form of legislation designed to eliminate past abuses and prevent future ones, § 302's prohibition combines an elimination of the then exist-

It was agreed that other matters in the administration of the Trust Fund must be joint (R. 13), Union Trustees may have access to and copy all Fund records (R. 13, 23, 24), and that the records will be available during trustee meetings. Also, with the exception of employment and salaries of the Trust Fund staff, it was agreed that a vote of all the Trustees had to be taken before payments of Fund monies occurred. (R. 17–22).

19. More particularly, whether the Trust Fund Agreement referred to in the 1962 through 1974 collective bargaining agreements may be the 27 August 1962 Trust Agreement.

20. [1959] U.S.Code Cong. & Ad.News, pp. 2318, 2321–33. See *Arroyo v. United States*, 1959, 359 U.S. 419, 425–26, 79 S.Ct. 864, 868–69, 3 L.Ed.2d 915; *see also United States v. Ryan*, 1956, 350 U.S. 299, 304, 76 S.Ct. 400, 100 L.Ed. 335.

21. Other examples of payments by employers to employee representatives which are precluded by § 302 are illustrated in *United States v. Pecora*, 3 Cir., 1973, 484 F.2d 1289 (testimonial dinner and gifts within § 302); *United States v. Overton*, 2 Cir., 1972, 470 F.2d 761 (payments made by non-employer corporate entity prohibited by § 302); *United States v. Lanni*, 3 Cir., 1972, 466 F.2d 1102 (employer payments to union officer's girl friend violate § 302). For an example of a restrictive interpretation of "representative" of an employer's employees made prior to the 1959 amendment of § 302 by the

Labor-Management Reporting and Disclosure Act of 1959, one should read *Ventimiglia v. United States*, 4 Cir., 1957, 242 F.2d 620. The holding in that case is no longer good law. See [1959] U.S.Code Cong. & Ad.News, pp. 2318, 2330.

22. Labor Management Relations Act, 1947, § 302(c)(6), 29 U.S.C. § 186(c)(6). Aside from the requirements of § 302, the existence of a trust fund satisfying state law requirements is a prerequisite to lawful employer payments to a trust fund under §§ 302(c)(5)(B), (c)(6). *Bricklayers, Masons and Plasterers International Union of America, Local Union No. 15, et al. v. Stuart Plastering Company, Inc.*, 5 Cir., 1975, 512 F.2d 1017, 1026. See text *infra* following note 28.

23. One is ". . . a trust fund established by such [employee] representative . . . ." Additionally, Employer Trustees do not directly challenge that the Trust Fund was created by such a representative. Of the requirements set forth in § 302(c)(5)(B) (a detailed written agreement, equal representation for employers and employees in the administration of the fund, a dispute-deadlock resolving mechanism, an annual audit, and an availability of a statement of results), the only portion Union Trustees contend is violated by § 10 is the equal representation requirement.

ing abuses with its future-looking "prophylactic" purpose. See *Local No. 2 of Operative Plasterers and Cement Masons International Association v. Paramount Plastering, Inc.,* 9 Cir., 1962, 310 F.2d 179, 186; *Employing Plasterers' Association of Chicago v. Journeyman Plasterers' Protective & Benevolent Society of Chicago,* 7 Cir., 1960, 279 F.2d 92, 97. To retain this preventive effect against the onslaught of creative devices to avoid § 302's application, this Court has recognized that strict compliance with the rigid structure of § 302 is necessary. In determining whether a trust fund satisfied the § 302(c)(5)(B) requirements, we have stated

> Judicial adherence to the intention of Congress in enacting Section 302 requires strict enforcement of the purposefully rigid structure provided in this section. *Stuart Plastering, supra* at 1026.

Likewise, if the Trust Fund under examination in this case comes within § 302's scope, such a strict enforcement of § 302(c)(5)(B)'s requirements must be followed.

### Anticipation Of Ratification

Recognizing that, with the exception of § 302(c)(5)(B)'s equality of administration provision, the other requisites are present in the existing documents, Employer Trustees direct their sole attack on appeal at whether the 27 August 1962 Trust Agreement *is* the agreement contemplated on or after September 1, 1962. In other words, they contend that although the 27 August Trust Agreement may meet § 302's requirements, it is not *the* Trust Fund Agreement called for by the September 1, 1962 collective bargaining agreement.[24]

An attempt to bolster this argument is made by invoking our prior decision in *Bricklayers, Masons and Plasterers International Union of America, Local Union No. 15, et al. v. Stuart Plastering,* 5 Cir., 1975, 512 F.2d 1017, on which Employer Trustees rely as supporting their argument that the collective bargaining agreements contemplated or anticipated ". . . a trust agreement in future." Even assuming this foundation to be based on bedrock—not shifting sand—we need not and do not address this issue. For ratification purposes, whether the Trust Agreement was executed before or after the 1962 collective bargaining agreement is irrelevant.[25] A written Trust Agreement exists which virtually tracks § 302's standards. Both Union and Employer representatives who are not challenged on this record as lacking authority executed the 27 August Trust Agreement which has been operated under and remains in effect without change. Thus, a writing within § 302's meaning exists if the 27 August Trust Agreement has been ratified.

Additionally and despite Employer Trustees' assertion, whether a written, executed trust agreement may be ratified by subsequent actions was not before the *Stuart*

---

**24.** The Employer Trustees contend that Article V, § 7 of the 1962 collective bargaining agreement, and as it has been utilized in subsequent collective bargaining agreements, *anticipates the creation of a trust fund.* This "anticipates" argument is partly founded on the literal language of § 7 stating "The parties to this Agreement *shall* have a joint apprenticeship and training Trust Fund Agreement . . . ." The remaining portion of their argument's foundation is the September 1, 1962 *execution* of the initial collective bargaining agreement compared to the August 27, 1962 signing of the Trust Agreement. Construing these items together, Employer Trustees contend that the September 1 collective bargaining agreement has required *and* envisioned execution of a post-September 1, 1962 Trust Fund Agreement. According to Employer Trustees, it is not the absence of a writing complying with § 302 which creates the lack of a writing in this instance. Rather, it is the absence of *the* writing contemplated to have been executed after the September 1, 1962 collective bargaining agreement. However, the 1962 Trust Agreement indicates the contrary. See note 28, *infra.*

**25.** Section 18 of the Trust Agreement states that "[t]his Trust . . . Agreement shall continue in effect for the period provided for in the current and any subsequent Collective Bargaining Agreement, and for the period of any renewal or extension . . . ." In light of this provision, we need not consider whether the Trust Fund may exist independent of the collective bargaining agreements. *See also Hinson v. N. L. R. B.,* 8 Cir., 1970, 428 F.2d 133, 138–39.

*Plastering* Court. In briefest form, *Stuart Plastering* entailed consideration of whether a collective bargaining agreement containing a schedule of payments, by itself,[26] satisfies § 302(c)(5). No trust agreement had been executed by the defendant employers[27] in *Stuart Plastering.* 512 F.2d at 1019–20.

Another singularly distinguishing factor is apparent from a close reading of *Stuart Plastering.* Whether a trust fund agreement could be ratified or similarly assented to was explicitly stated *not* to be before the Court.

"Moreover, the appellants do not now contend, nor did they offer to prove in the district court, that the defendants ratified or assented to this particular agreement by making any payments that were consistent with its terms after the apparent date on its face." *Id.* at 1029.

26. In *Stuart Plastering,* the collective bargaining agreement provided "the following amounts [specified . . . under the 'health and welfare' benefits schedule and the 'pension' benefits schedule] shall be paid into health and welfare fund". 512 F.2d at 1020.

27. Significant are the disparities between that case and this one. In *Stuart Plastering* only a collective bargaining agreement had been executed. Of the two trust instruments, the one for a health and welfare fund had not been executed by any of the defendant employers. The other for a pension fund had been drafted but not signed by any employer who was a party to the collective bargaining agreement. Unlike this *Gold Coast Trust* case, *Stuart Plastering* represents an instance when *no* written trust agreement had been consummated by the employer parties.

28. The District Court trial transcript indicates the consensus. Union Trustees presented two witnesses during trial: Charles Perez and Michael Costello. On cross-examination by Employer Trustees' attorney, Costello responded in the affirmative to counsel's inquiry regarding whether the provision of § 7 refers to the 27 August 1962 Trust Agreement. (R. 175–76). During direct questioning by the Court, Perez was asked:
> "Well, let me ask the question and see if I can get an answer to it. In Section 7 it says the parties to the working agreement shall have a joint apprenticeship and training trust fund agreement. Now, is there one?
> Perez: Why yes, there is.

For these reasons, *Stuart Plastering* cannot be considered as expressing this Court's view on the ability of a union to ratify or adopt the terms of a written, executed trust agreement.

### Ratification, Adoption, Or The Childless Parent

■ Under the pervasive evidence in the record regarding their beliefs[28] and the consistent conduct of the parties, Union and Employer Trustees have continually indicated that the 27 August writing is the Trust Fund Agreement required by the collective bargaining agreements. Consequently, the dispositive question is whether Florida law would recognize the Trust Agreement drafted, executed, and operated under by the parties as the agreement contemplated by Union and Employer Trustees. In other words, under Florida law does the conduct of the parties constitute a ratification or adoption of the 27 August 1962 Trust Agreement?[29]

> The Court: And is that the one of August 27, 1962?
> Perez: Why yes, it is." (R. 121).

Also, Union Trustees' attorney indicated in a colloquy with the Court that there is no contention by Union Trustees that the 27 August Trust Agreement is not the one that they have been operating under. (R. 78).

Additionally, the testimony of Marshall Williams who was the only witness for Employer Trustees indicates that the 27 August 1962 Trust Agreement is the one called for and operated under the successive collective bargaining agreements. (R. 130–33).

The testimony of Union Trustees' counsel, of two Union Trustee witnesses, and of Employer Trustees' witness, Marshall Williams who was the Union's business manager during the negotiations for the Trust Agreement and the 1962 collective bargaining agreement, indicates that all parties recognize that and have acted as if the 27 August Trust Agreement was and is the one required by Article V, § 7 of the respective collective bargaining agreements.

Further support for this proposition is found in § 2 of the 27 August 1962 Trust Agreement which states ". . . It shall be the duty of the individual employers and the Union to remit to the Trustees sums in accordance with the Collective Bargaining Agreement, beginning with the first payroll period following September 1, 1962."

29. This Circuit has recognized that there is an exception to the preemption doctrine for "matters of peripheral concern to federal labor law." One of the areas not removed from governing

In considering whether ratification is a viable theory under Florida law, an important factor is that Marshall Williams signed the 27 August Trust Agreement on behalf of Union and Karl Behkne signed it on behalf of Employers' Association. (R. 37–38). No challenge has been made of the authority of these individuals to execute the 27 August Trust Agreement for their principals. Also, this Trust Agreement was drafted by representatives for Union and Employers Association and, thus, with the knowledge and consent of both sides to the agreement. These parties have consistently recognized and acted in a manner which demonstrates ratification. They have continually operated the Trust Fund from its inception to the present day in conformity with the 27 August Trust Agreement as authorized by Article V, § 7 of each collective bargaining agreement subsequent to 1962.

In *G & M Restaurants Corporation v. Tropical Music Service, Inc.*, 2d Dist.Fla. App., 1964, 161 So.2d 556, 557–58, the Florida District Court quotes from generally recognized agency authorities that

" ' . . . Ratification as it relates to the law of agency is the express or implied adoption and confirmation by one person of an act or contract performed or entered into in his behalf by another without authority . . . However, . . . it is ordinarily required that for a ratification of an unauthorized act or transaction of an agent to be valid and binding, the principal shall have full knowledge, at the time of the ratification, of all material facts and circumstances relating to the unauthorized act or transaction, . . . .' In speaking of ratification, it is universally held that '[i]t is always necessary, in order to have an effective ratification, that there shall be an intention on the part of the purported principal to ratify the act in question.' Moreover, the required intention must be manifested in some way." (Citations omitted).

■ For Union, no question exists about its full knowledge and intent to ratify. Union manifested this ratification and has accepted the benefits of the Trust Fund. Apprentices have entered this program, been trained, and become full-fledged, card carrying dues paying members of Local 728. For each of these Local 728 members, contributions have been made into the Trust Fund benefiting Union Trustees and those they represent. In such circumstances, a Florida Court would hold that Union has ratified the written, executed Trust Agreement. See *Branford State Bank v. Howell Company*, 1924, 88 Fla. 493, 102 So. 649, 650; *Oxford Lake Line v. First National Bank of Pensacola*, 1898, 40 Fla. 349, 24 So. 480, 482–84; see also, *Smith v. Loftis Plumbing and Heating Co.*, 1933, 112 Fla. 382, 150 So. 645; *Bellaire Securities Corp. v. Brown*, 1936, 124 Fla. 47, 168 So. 625; *Proodian v. Plymouth Citrus Growers Association*, 1943, 152 Fla. 684, 13 So.2d 15.

The only possible valid defense Employer Trustees offer against ratification is that the union members must vote their approval of the Trust Agreement. Nothing in the record indicates that the Trust Agreement had to ever be directly voted on by the union membership. Absent an explicit requirement for this "voting requirement", we find this assertion to be without merit.

Probably the ultimate manifestation of ratification, and accordingly most telling blow to Employer Trustees' no ratification argument, is Union Trustees continued attempts to have the disputed provision of the Trust Agreement altered or deleted. How can one contend that a provision of an

---

state law is the creation of trust funds for the benefit of union members. Such funds are established under the laws of the relevant state. See *Craig v. Bemis Company, Inc.*, 5 Cir., 1975, 517 F.2d 677, 678; *Connell v. United States Steel Corporation*, 5 Cir., 1975, 516 F.2d 401, 405; *Bricklayers, Masons and Plasterers International Union v. Stuart Plastering Com-*

*pany, Inc.*, 5 Cir., 1975, 512 F.2d 1017, 1025; *Snider v. All State Administrators, Inc.*, 5 Cir., 1973, 481 F.2d 387, 390. For this reason, this Court defers to Florida law to determine whether the conduct of the parties constitutes a ratification of the 27 August Agreement or another form of acceptance of that agreement.

agreement is illegal or must be changed if one has not ratified, adopted or otherwise accepted that agreement? From their converse position, how can Employer Trustees contend that § 10 is proper if the 27 August Trust Agreement has not been ratified?

 Following this Florida authority, the actions and conduct discussed above indicate that all parties intended, still intend, believed and still believe, the written executed 27 August 1962 Trust Agreement to be *the* agreement required by each of the collective bargaining agreements. By ratification, the 27 August Trust Agreement is the Trust Fund Agreement contemplated by Article V, § 7. We do not accept Employer Trustees' contention that under the respective collective bargaining agreements—the Trust Fund's parent documents—ratification is precluded. Consequently, the Trust Fund does not have a gap in its lineage for want of the necessary Trust Fund Agreement.

The District Court's erroneous finding was caused by misplaced reliance on *Moglia v. Geoghegan*, 2 Cir., 1968, 403 F.2d 110, *cert. denied*, 394 U.S. 919, 89 S.Ct. 1193, 22 L.Ed.2d 453; and *Local Union No. 529, United Brotherhood of Carpenters and Joiners of America v. Bracy Development Co., Inc.*, W.D.Ark., 1971, 321 F.Supp. 869.[30] Scrutiny of these cases reveals their inapplicability to this Union Trustee-Employer Trustee dispute.

*Moglia* addresses whether payments could legally be made into a trust fund by an employer who was not a party to the signed trust agreement and had repeatedly refused to be a signatory of the collective bargaining agreements which required a trust agreement. Why the *Moglia* Court found lack of mutuality of agreement and mutuality of obligation necessary for ratification is evident. The employer in *Moglia* had declined[31] to

become a party to both the collective bargaining agreement and the trust agreement.

In a similar fashion, *Bracy Development Co., Inc., supra,* is not applicable. In this Western District of Arkansas case, Bracy was not a member of the Contractors Association which had negotiated the collective bargaining and trust agreements. Bracy never executed these agreements, nor did Local 529 present evidence showing that an agent of Bracy's with sufficient express, implied, or inherent authority executed these documents for Bracy.

Unlike *Moglia* and *Bracy,* this case is an instance where Employer and Union representatives negotiated, drafted, and executed both a Trust Agreement and collective bargaining agreements, and subsequently conducted their affairs in accordance with the terms of each for over twelve years. Because of these differences, *Moglia* and *Bracy* do not sustain their usage by the District Court for the proposition that Union and Employer Association have never executed a written Trust Fund Agreement for the years in question. One was executed on 27 August 1962 and subsequently ratified.

As a second basis for its conclusion that Union Trustees are not entitled to a voice in the selection and direction of the employees of the Trust Fund, the District Court also predicated its opinion on the following, rather unilluminating recitation.

"In addition, the Apprenticeship Trust Fund which has been in operation is wholly funded by the employer. In such event it is not controlled by Section 302 of the Taft-Hartley Act so that the employer must give the union an equal voice in the operation of the Fund. *Independent Association of Mutual Employees of New York State v. New York [Racing Ass'n],* 398 F.2d 587 (2d Cir., 1968)."

---

**30.** It also cited *Hinson v. NLRB*, 8 Cir., 1970, 428 F.2d 133. However, *Hinson* considers a different issue. It is, under the NLRB Act, the extent to which an employer is bound by commitments made in a collective bargaining contract and incidental trust agreement after ter-

mination of the collective bargaining agreement.

**31.** The non-execution was stipulated in *Moglia, supra* at 110, n. 5.

In *Independent Association of Mutual Employees,* payments were made by an employer to a trust fund benefiting his employees, an employee representative. See *Local No. 2 of Operative Plasterers and Cement Masons International Association v. Paramount Plastering, Inc.,* 9 Cir., 1962, 310 F.2d 179, 182–83, 185–86, *cert. denied,* 372 U.S. 944, 83 S.Ct. 935, 9 L.Ed.2d 969; *Mechanical Contractors Association of Philadelphia, Inc. v. Local Union 420,* 3 Cir., 1959, 265 F.2d 607, 610–11; *Sheet Metal Workers Association of San Francisco v. Sheet Metal Workers International Association,* 9 Cir., 1957, 248 F.2d 307, 315. Any such payments are illegal unless all the prerequisites of § 302 are met. The one absent in *Independent Association of Mutual Employees* and this case is equality of administration under § 302(c)(5)(B). We find it impossible to approve *Independent Association of Mutual Employees* the affect of which would be to encourage open, flagrant violation of the Act by the simple expediency of having all of the contributions from the employer.[32] Thus, it does not sustain the District Court's determination that this Trust Fund is not governed by § 302 of the LMRA.

■ On the basis of our determination from the overwhelming evidence that a written Trust Agreement was executed and ratified and an improper legal standard was utilized, the trial court's conclusion that as a matter of law a written trust agreement ". . . has not been executed by union

and management" and its finding that no written trust agreement exists may not stand.[33]

### Equality Versus Inequality

The plain terms of § 302(a) indicate in subdivision (1) that before a § 302 trust exists requiring compliance with the provisions of § 302(c)(5)(B), a payment must be made from an employer to ". . . any representative of any of his employees who are employed in an industry affecting commerce".

The payments by the contractor members of Employer Association represent payments by an employer to an employee "representative" within the meaning of and the prohibitions of § 302(a)(1).[34] See *Operative Plasterers and Cement Masons, supra* at 182–86; *Mechanical Contractors Association of Philadelphia, supra* at 610–11; *Sheet Metal Workers Association of San Francisco, supra* at 315. Thus, this Trust Fund must comply with § 302.

■ One of the mandates of § 302(c)(5)(B) is that there be equal representation by employers and employees in the administration of the trust fund. 29 U.S.C. § 186(c)(5)(B). Knowing that § 302 requires equal representation, remembering that the purpose of § 302 is, at the least partially, to prevent abuses—not requiring that one actually occur,[35] and being aware

---

**32.** Without intimating that any evil motive exists in this instance—for none does—an additional consideration regarding human predispositions supports our disapproval of *Independent Association of Mutual Employees.* It is a matter of human experience that successful organizational activity generally hinges on the quality of its executive direction. In a situation such as the one here, the motives of a trust's executive director whose pay is controlled by Employer Trustees and who is also an employee of Employers—Chapter Manager of NECA—acting in significant labor matters on Employers' behalf may easily be affected in significant Trust Fund decisions and operations including, but not limited to, the selection and employment of the Trust's personnel.

**33.** Because an improper legal standard was used, the District Court's findings do not come

to this Court with the usual "Buckler and Shield" of F.R.Civ.P. 52(a). In other terms, a standard of deference to trial court findings below the clearly erroneous one applies to this instance. *Battelstein Investment Co. v. United States,* 5 Cir., 1971, 442 F.2d 87, 92; *McGowan v. United States,* 5 Cir., 1961, 296 F.2d 252, 254. See *Perkins v. Mississippi,* 5 Cir., 1972, 455 F.2d 7, 44 (Brown, C. J., dissenting).

**34.** Aside from the fact that the payments in this case are prohibited under § 302 unless its requirements are met, it should be remembered that Article V, § 7 of the collective bargaining agreements calls for a written trust fund agreement meeting the § 302 standards.

**35.** See *Paramount Plastering, supra* at 186; *Journeyman Plasterers' Protective & Benevolent Society of Chicago, supra* at 97.

of the infinite creativity of mankind to circumvent such statutory schemes, we conclude that § 10 of the 27 August Trust Agreement violates the provisions of § 302(c)(6) and (c)(5)(B) requiring equal representation. Although we wish to emphasize that none of the flagrant, impermissible abuses which gave birth to § 302 have occurred in this case,[36] our decision is based upon the recognition that § 302 would be eviscerated should the phrase "employees and employers are equally represented in the administration of such fund" connotate *only* the requirement that employees and employers have equal numbers of trustees, three each in this case, or representatives.

If one wishes to circumvent the purposes for which § 302 was adopted, it requires little ingenuity to foresee that control over the hiring, firing, and salary determinations of Trust Fund employees solely by Employer Trustees would enable the unscrupulous union representative to seek indirect payments of the form § 302 was designed to prevent by demanding employment of friends or relatives. At the opposite extreme, an employer bent on the disaffection of an employee representative may offer employment to such a person's spouse, relative, or friend.

Of more immediate bearing to this case is the existence of a trust fund created for the benefit of employees which has an administration exclusively chosen and controlled by Employer Trustees. In 1967, the Director of the Trust Fund shifted from Union's to Employers' employment and signed a contract which provides for a salary of approx-

imately $50,000 per year by 1972 plus reimbursement for business expenses including twenty cents per mile for automobile expenses. As an additional complication, the Executive Director also acts as NECA Chapter Manager, the Employer Association's. It does not strain one's imagination to think that any trust fund administrator—especially one for the benefit of employees—will listen closely to the words of his major master, Employer Trustees.[37]

These are the subtle forces that have often tempted the most honorable among us. It is the preventive aspect of § 302 which recognizes the frailty inherent in mankind and seeks to avert these temptations by specifying a rigid structure before the Gold Coast Electrical Joint Apprenticeship and Training Trust Fund, or any trust fund, is exempted from its prohibitions. For these reasons, strict application of the mandates of § 302 is required by this Court to this Trust Agreement.

■ In summary, we find that (i) a written Trust Fund Agreement containing within its four corners all of the requirements of § 302 of the LMRA has existed, been ratified, and continues to be operated under, (ii) the Gold Coast Electrical Joint Apprenticeship and Training Trust Fund must comply with the provisions of § 302 of the Labor Management Relations Act of 1947, and (iii) § 10 of the Trust Agreement violates § 302(c)(5)(B) requiring equal representation.[38] For these reasons, the ruling of the District Court is reversed.

REVERSED.

**36.** Indeed, the record shows that all parties have acted with the utmost propriety.

**37.** Because of our disposition of this case, we do not consider whether any conflicts with § 302's requirements or with the fiduciary aspects present in all trust situations arise from holding the dual position of Executive Director of the Trust Fund and Chapter Manager of NECA.

**38.** In making this decision, one additional factor must be addressed. Simply because we find that § 10 of the Trust Agreement violates § 302(c)(5)(B), this does not and is not to be

construed as a determination that the entire Trust Agreement and Trust Fund structure violate § 302. Section 17 of the Trust Agreement contains a severability provision. ". . . In the event that any of the provisions of this Trust Fund Agreement is held to be illegal or invalid . . . such illegality or invalidity shall not affect the remaining provisions of the agreement unless such illegality or invalidity prevents the accomplishment of the purposes and objectives of this Trust Fund Agreement." This severability clause and § 10's limited impact—its correction cures the defect—allows the Trust Agreement and Trust Fund to remain.