**SOHYDE DRILLING & MARINE CO. and Sohyde Drilling & Exploration Co., whose name has been changed to Spade Drilling & Exploration Co., Plaintiffs,**

v.

**COASTAL STATES GAS PRODUCING CO., Defendant-3rd Party Plaintiff-Appellee,**

v.

**SOHYDE DRILLING & MARINE CO. and Sohyde Drilling & Exploration Co. (Sohyde Drilling & Workovers, Inc.), name changed to Spade Drilling & Exploration Co. and Market Insurance Co., 3rd Party Defendants-Appellants,**

**The Travelers Insurance Co., 3rd Party Defendant.**

No. 78–2817.

United States Court of Appeals, Fifth Circuit.

May 14, 1981.

Rehearing and Rehearing En Banc Denied June 23, 1981.

William A. Porteous, III, New Orleans, La., for plaintiffs.

Monroe & Lemann, William J. Hamlin and Benjamin R. Slater, Jr., New Orleans, La., for defendant-3rd party plaintiff-appellee.

Before BROWN, AINSWORTH and FRANK M. JOHNSON, Jr., Circuit Judges.

JOHN R. BROWN, Circuit Judge:

Appellants, Sohyde Drilling and Marine Co. (Sohyde) and others, appeal from an adverse judgment by the District Court which found them liable to Appellee, Coastal States Gas Producing Co. (Coastal), for property damages arising out of the blowout of Coastal's high pressure gas well. The blowout occurred while Sohyde was performing workover operations on the well aboard its submersible drilling barge which, at the time, was resting on the bottom of a dead-end dredged canal slip in Louisiana.

Because we find that the District Court improperly assumed admiralty jurisdiction in this case, we vacate and remand.

### Blowout In The Marsh

The essential facts of this case are not in dispute. In 1971, Coastal was the operator of a high pressure gas well which was dually completed so that production was being obtained from two separate producing zones. The well was located within the State of Louisiana, approximately six miles south of the town of Delcambre, in a dead-end dredged canal slip approximately eight feet deep and 120 feet wide. The slip was connected to the Intracoastal Waterway and Vermillion Bay by navigable canals and was accessible only by water transportation such as barges, crew boats or sea planes—the nearest solid ground being approximately two miles away.

In June 1971, Coastal determined that damaged tubing in the well was causing gas to leak from the lower producing zone to the upper zone. On July 7, 1971, Coastal contracted with Sohyde to perform work-over operations on the well.[1] Thereafter, Sohyde towed a submersible drilling barge, the Sohyde 28, onto location, submersed it to the bottom of the canal, and commenced operations. On July 13, during the course of operations, the well blew out and ultimately caught on fire, causing extensive damage.

Following the well blowout, various claims, counter-claims and cross-claims ensued. Ultimately all of these actions, including Jones Act claims, were settled, save claims by Coastal against Sohyde and its liability insurers—Market Insurance Co. and Employers Surplus Lines Insurance Co. Coastal's claims were solely for property damages arising out of the well blowout, including damages for control of the blowout, repair of damaged well facilities, compensation for lost gas and the like.

After a bench trial, the District Court concluded first that it had jurisdiction in admiralty. The Court then found that the well blowout was proximately due 75% to the negligence of Sohyde and 25% to the negligence of Coastal. In accordance with these findings, the Court entered judgment in favor of Coastal for $1,761,898.74. The Court further concluded that Sohyde's liability to Coastal was covered under the insurance policies it had with the two insurance companies.

This appeal was brought by Market Insurance Co. on its own behalf and on behalf of Sohyde—for purposes of simplification the collective appeal is referred to as one by Sohyde—limited solely to that portion of the judgment apportioned to Market.[2] Two points are urged on this appeal. First, it is contended that admiralty jurisdiction does not lie over this claim. Second, it is argued that Market's insurance policy does not cover the liability of Sohyde to Coastal.

### A Maritime Blowout?

The jurisdictional question is of crucial importance in this case. Sohyde maintains that admiralty jurisdiction was improperly assumed by the District Court and that under diversity jurisdiction Louisiana's contributory negligence rule bars recovery.[3] Coastal contends that the District Court properly assumed jurisdiction in admiralty and, therefore, properly applied the maritime rule of comparative negligence.

Although the express stated findings of the District Court with respect to the jurisdictional question are not extensive, it is evident that the Court felt admiralty juris-

---

1. Various Sohyde entities were involved in this case. Sohyde Drilling and Workover Company entered into the contract with Coastal; Sohyde Drilling and Marine Company owned the barge; and Sohyde Drilling and Exploration Company owned certain equipment located on the barge. Because it is unnecessary to distinguish between these various entities, for purposes of this appeal we refer to them collectively as "Sohyde".

2. Market's policy with Sohyde contained a $100,000.00 policy limit.

3. Sohyde asserts in the alternative that even if admiralty jurisdiction lies in this case, Louisiana substantive law should apply. In light of our ultimate holding, we need not pass on this question.

diction to be appropriate under the Admiralty Extension Act, 46 U.S.C. § 740. We agree with the District Court that if admiralty jurisdiction is to be found in this case, this Act must be its source.

The Act, in pertinent part, provides:

The admiralty and maritime jurisdiction of the United States shall extend to and include all cases of damage or injury, to person or property, caused by a vessel on navigable water, notwithstanding that such damage or injury be done or consummated on land.

Under the express terms of the Act, our jurisdictional inquiry on appeal would seem to be limited to whether the Sohyde 28 was a "vessel" and whether it was on "navigable water" at the time it caused the property damage in question. However, we believe that there is a more fundamental inquiry which confronts us—that is, whether the wrong asserted in the instant action bears a significant relationship to maritime activity. In short we believe, the seemingly unequivocal language of the Act notwithstanding, that "vessel" plus "navigable water" does not necessarily equal admiralty jurisdiction under the Act.

■ Our conclusion on this score stems from our conviction that jurisdiction under the Admiralty Extension Act, enacted in 1948, is necessarily constrained by the principles set forth in the subsequent Supreme Court case of *Executive Jet Aviation, Inc. v. Cleveland*, 409 U.S. 249, 93 S.Ct. 493, 34 L.Ed.2d 454 (1972), and the case law left in its somewhat irregular contrails. In this regard, it is now well established in this Circuit, on the strength of *Executive Jet*, that for admiralty jurisdiction to lie over a general maritime tort action not only must the locality test be met but also the injury complained of must bear a significant relationship to maritime activity. *Moser v. Texas Trailer Corp.*, 623 F.2d 1006, 1009 (5th Cir. 1980); *Sperry Rand Corp. v. Radio Corp. of America*, 618 F.2d 319, 321 (5th Cir. 1980). This, of course, does not answer the related question of whether the *Executive Jet* rule, clearly applicable to general maritime tort actions, is also applicable to tort actions brought under the Admiralty Extension Act. Because we find no case in this Circuit which has squarely resolved this question, we believe that before proceeding further this point merits discussion.

## The Extent of Extension

We find support for our conclusion that the *Executive Jet* rule constrains the Admiralty Extension Act in the legislative history of the Act itself. The legislative history makes clear that the purpose of the Act was to correct the inequities, and anomalies, arising under then existing law which extended admiralty jurisdiction only to those cases in which injury was actually done or consumated upon navigable waters. For example, as the legislative history observes, prior to 1948 when a vessel collided with a bridge through mutual fault and both were damaged, the owner of the bridge was denied an action in admiralty and thus was barred from recovery because of the contributory negligence barrier, whereas the vessel owner was entitled to recovery against the bridge owner in admiralty, contributory negligence operating only to reduce the recovery under the then available theory of mutual fault—more recently replaced by application of the rule of real comparative fault. *United States v. Reliable Transfer Co.*, 421 U.S. 397, 95 S.Ct. 1708, 44 L.Ed.2d 251 (1975). The Act was designed to correct situations such as this, arising from the strict locality test, allowing actions by both vessel owner and bridge owner to be resolved in admiralty. U.S. Code Cong. Service, pp. 1898, 1899 (1948). Even more significant, the Act afforded an effective remedy to the innocent owner of land-based property damaged as a result of glaring fault upon the part of a compulsory pilot aboard the vessel for whose fault the vessel owner would ordinarily not be held liable. *See Homer Ramsdale Transp. Co. v. LaCompagnie Generale Transatlantique*, 182 U.S. 406, 21 S.Ct. 831, 45 L.Ed. 1155 (1901).

The legislative history further observes:

Adoption of the bill will not create new causes of action. It merely specifically

directs the courts to exercise the admiralty and maritime jurisdiction of the United States already conferred by article III, section 2 of the Constitution and already authorized by the Judiciary acts.

*Id.,* at 1900. This observation was echoed by this Court in *Louisville & N.R. Co. v. M/V Bayou Lacombe,* 597 F.2d 469 (5th Cir. 1979). In that case, a railroad company brought a claim in admiralty for damages for the loss of the use of a bridge—which the railroad did not own and in which it had no Alabama property interest—negligently struck by a vessel. Although recovery for damages of this kind was seemingly barred under the established rule of maritime law enunciated in *Robins Dry Dock & Repair Co. v. Flint,* 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290 (1927), the railroad company argued that the rule in question was irrelevant under the Admiralty Extension Act which, according to the railroad, permitted recovery for *all* injuries to property. This Court, in an opinion by Judge Wisdom, rejected this argument finding, "the Act . . . does not create new causes of action; it merely expands the locality rule of admiralty jurisdiction to encompass 'ship-to-shore' torts." *Id.,* at 472, and on the basis of *Robins,* and our cases following it, held there was no claim for tortious interference with contractual relations. To do so would, in the Court's view, be the creation of a new cause of action.

■ In sum, we find that the Admiralty Extension Act was intended to eliminate the inequities, and anomalies, resulting from the strict application of the locality rule in admiralty under then existing law. The Act was not intended to grant claimants new substantive rights of recovery nor relieve them from jurisdictional constraints unrelated to locality—*a la Executive Jet* —imposed on general maritime tort claimants. Accordingly, we find claims under

the Admiralty Extension Act to be subject to the "maritime relationship" rule of *Executive Jet.*[4]

*Substantially Salty?: Of Jets And Vessels*

■ Having concluded that actions under the Admiralty Extension Act are subject to the *Executive Jet* "maritime relationship" rule, we now consider that rule in light of the facts of the instant case. This Court in *Kelly v. Smith,* 485 F.2d 520, 525 (5th Cir. 1973) outlined four factors which may be considered in determining the existence of a substantial maritime relationship: (i) The functions and roles of the parties; (ii) the types of vehicles and instrumentalities involved; (iii) the causation and type of injury; and (iv) traditional concepts of the role of admiralty law. Upon consideration of· each of these factors, we are unable to say that the circumstances surrounding the incident which gave rise to this action had a substantial maritime relationship.

■ Factor (i) under *Kelly* is the functions and roles of the parties. The two principal parties involved in this case are Coastal and Sohyde. At the time of this incident, Coastal was the operator of the gas well, and its basic function was to obtain production of gas from the well. Sohyde was a contractor whose function was to perform workover operations on the well to correct loss of production. The functions and roles of these parties was hardly of a peculiarly maritime nature.

Factor (ii) under *Kelly,* the vehicles and instrumentalities involved, gives us somewhat greater pause. The "vehicle" involved in this case was a submersible drilling barge which, at the time of the well blowout, was resting on the bottom of an eight foot deep canal. There seems little doubt that if the present action were one for personal injuries under the Jones Act or maritime law sustained by one having the

---

4. At least three Federal District Courts and one noteworthy treatise have reached this same conclusion. See *Jorsch v. LeBeau,* 449 F.Supp. 485, 487 (N.D.Ill., 1978); *Roberts v. Grammer,* 432 F.Supp. 16, 18 (E.D.Tenn.1977); *Complaint of Cook Transportation System, Inc.,* 431 F.Supp. 437, 442 (W.D.Tenn.1976). *See also*

7A Moore's Federal Practice (2d ed.) ¶ .325[4] n. 30 (Supp.): "The fact that a vessel causes shore-inflicted harm is not itself sufficient to trigger application of the Extension of Admiralty Jurisdiction Act. There must, additionally, be some maritime nexus."

status of a *Robison* seaman that the drilling barge, even in its submerged position, would be considered a "vessel" for purposes of the Act. *See, Offshore Co. v. Robison*, 266 F.2d 769, 779, 1959 A.M.C. 2049 (5th Cir. 1959); *Producers Drilling Company v. Gray*, 361 F.2d 432, 434 (5th Cir. 1966). However, we are not convinced that the term "vessel" for Jones Act purposes, which is subject to liberal construction consistent with the purposes of the Act, is necessarily a vessel for other purposes as well.[5] At any rate, we believe that even though a structure may meet some abstract definition of "vessel" under certain circumstances, this is not necessarily dispositive of the issue of whether the structure has a substantial relationship to maritime activity at the time of the incident in question. With regard to the instant case, if prior to the well blowout Sinbad had been retrieved from Davey Jones' locker and placed on the deck of the Sohyde 28, it is doubtful that among the first words to leave his mouth would have been "weigh anchor". Although the Sohyde 28 may have had some maritime character at the time of the well blowout—in the sense that it floated in and presumably would float out—it clearly was not substantial.

As for the "instrumentalities" involved in this case, they were essentially the same as those involved in a land-based workover operation. The record is littered with references to blowout preventers (consisting of pipe rams, blind rams and hydrils), tubing, drilling mud, and the like. None of these instrumentalities have a peculiarly salty flavor.

Factor (iii) under *Kelly*, the causation and type of injury, similarly has little maritime character. The District Court found among the causes of the well blowout were the failure of Sohyde to maintain proper mud levels during the process of changing rams on the blowout preventers, the failure of Sohyde to complete the ram change operations within a reasonable period of time under the prevailing emergency conditions, the failure of Sohyde to maintain its equipment in fit condition, and the failure of Coastal properly to supervise the operations. All of these causative factors could just as easily have occurred on land.

5. Certain language in *Robison* suggests that the term "vessel" is given particularly liberal construction under the Jones Act and thus that a "Jones Act vessel" might not necessarily be a "vessel" for other purposes:

> The [Jones] Act has always been construed liberally, but recent decisions have expanded the coverage of the Jones Act to include almost any workman sustaining almost any injury while employed on almost any structure that once floated or is capable of floating on navigable waters.

266 F.2d at 771.

\* \* \* \* \* \*

> ... under the Jones Act a vessel may mean something more than a means of transport on water.

*Id.* at 776.

\* \* \* \* \* \*

> Expansion of the terms 'seaman' and 'vessel' are consistent with the liberal construction of the Act that has characterized it from the beginning and is consistent with its purposes.

*Id.* at 780. *See also* 7A *Moore's* at ¶ .215[6]:

> When attempting to determine whether a structure is or is not a "vessel", within the scope of a particular statutory enactment, the underlying intent of the legislature should be ascertained, if at all feasible. Notwithstanding that two statutes contain substantially similar definitions of the term vessel, what may reasonably qualify as a "vessel" for the purpose of one statute might well thwart the purpose of the other statute.

*Id.* at pp. 2432–33.

\* \* \* \* \* \*

> Thus, notwithstanding two statutes may contain substantially identical language or even both adopt the same statutory definition of "vessel," it is entirely conceivable that what may constitute a "vessel" for one purpose may well constitute a different type of structure for purposes of applying the other statute. In short, reason and legislative intent must prevail over a literal reading of the acts.

*Id.* at p. 2434.

The problem is also posed in determining whether a structure classed as a vessel for Jones Act purposes is a "vessel" for purposes of Limitation of Shipowner's Liability, 46 U.S.C.A. § 181, *et seq. See, In re United States Air Force Texas Tower No. 4*, 203 F.Supp. 215 (S.D.N.Y.1962).

Finally, for a review of cases in which courts have been forced to draw distinctions between terms which have different meanings depending on the federal statute or policy being invoked, *see Stevens v. Seacoast Company*, 414 F.2d 1032, 1039 n. 8 (5th Cir. 1969).

The injury occasioned in this case was merely a well blowout with attendant property damage and loss. The District Court awarded damages to Coastal for expenses incurred in attempting to control the well blowout, repairing surface facilities at the well, achieving partial production of reserves from a relief well, and plugging and abandoning the original well. The Court awarded additional damages for the value of gas which burned or escaped before the well was controlled and the value of gas lost in reserves which could have been produced. Damages of this type are indistinguishable from those arising from land-based well blowouts.

The final *Kelly* factor (iv), the traditional concept of the role of admiralty, similarly does not compel us to find a substantial maritime relationship in this case. As the Court stated in *Kelly*: "The admiralty jurisdiction of federal courts stems from the important national interest in uniformity of law and remedies for those facing the hazards of waterborne navigation." 485 F.2d at 526. This case, which involves a well blowout in a dead-end canal slip in Louisiana is simply not of such a character that leaving the parties to pursue state law remedies would disturb the federal interest of maintaining the uniformity of maritime law. Under the circumstances, we believe that the interests of federal-state comity would be best served by having this dispute resolved under state law.

#### Dispute Anchored In Louisiana

■ Although we conclude that admiralty jurisdiction was improperly assumed in this case because of the lack of a substantial maritime relationship, we nevertheless remand this case for further proceedings by the District Court. The District Court's conclusion that the cause of the well blowout was 25% due to the negligence of Coastal was made in light of its erroneous conclusion that the maritime rule of comparative negligence controlled the case. Findings which are made under erroneous legal principles cannot be credited. *See Kirksey v. City of Jackson*, 625 F.2d 21, 21–22 (5th Cir.

1980); *NLRB v. Alterman Transport Lines*, 587 F.2d 212, 220 (5th Cir. 1979); *Theriault v. Silber*, 547 F.2d 1279, 1280 (5th Cir.), *cert. denied*, 434 U.S. 871, 98 S.Ct. 216, 54 L.Ed.2d 150 (1977); *Costello v. Lipsitz*, 547 F.2d 1267, 1276–77 (5th Cir.), *cert. denied*, 434 U.S. 829, 98 S.Ct. 109, 54 L.Ed.2d 88 (1977). Consequently, we are unable to say that the District Court would have reached the same conclusion if it had considered the case in light of the contributory negligence rule of Louisiana, and accordingly we deem remand to be appropriate.

By our remand, we make no intimations as to the appropriate allocation of fault by the District Court in this case, nor, even more fundamentally, as to whether Federal jurisdiction lies under some ground other than admiralty. Furthermore, we not pass at this time on the question of whether Market's insurance policy covers any liability which Sohyde might ultimately have to Coastal since there is at least a reasonable possibility that this question may be rendered moot by the liability decision, if any, of the District Court on remand.

VACATED AND REMANDED.